UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DE'JUAN THOMAS,<br><br>Plaintiff,<br>v.<br><br>SALLY GRYDER, JAMES LEBLANC, JERRY GOODWIN, DOES 1-10,<br><br>Defendants. | 3:17-cv-01595-SDD-EWD |

**Memorandum in Support of Motion for Summary Judgment**

### I.  INTRODUCTION

In this case, Defendants admit that they failed to do what they were "legally bound" to do for former inmate De'Juan Thomas. Specifically, they admit that:

1. They "are legally bound to release inmates on their correct release date." Ex. B at RFA 2.

2. That the "correct release date" for Mr. Thomas was **June 5, 2015**. R. Doc. 45 (Answer) at ¶ 80.

3. That they did not release Mr. Thomas until **January 13, 2017**. *Id*. at ¶ 14.

Defendants concede they detained Mr. Thomas five hundred and eighty-nine days past his "correct release date."

That overdetention violated Mr. Thomas' constitutional rights. *See Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) ("There is a Clearly Established Right to Timely Release from Prison."). As Judge Dick recently summarized it:

> These people were detained past their release date, end of story. Liberty interest, end of story. Constitutional violation. I don't know how in the world you argue that's not a constitutional violation.

*Crittindon v. Gusman*, M.D. La. 17-512 (Sept. 18, 2018), Ex. F at 23.

Thus, there is no dispute that Mr. Thomas was held more than a year and a half past his correct release date, violating the duty that Defendants were "legally bound" to carry out. The question before this Court is this: who should be held accountable for it?

1

Defendant Sally Gryder should be held accountable because she was the DOC employee who changed Mr. Thomas' release date, despite admitting that there was "literally nothing, no rule, no policy" prompting her to do so.

The Department of Corrections, via Secretary LeBlanc and Warden Goodwin in their official capacities, should be held accountable because there is a longstanding, well-documented pattern of overdetention in Louisiana. For at least seven years, the DOC has known of a pattern of *hundreds* of inmates *per month* being held past the point when "a judge ordered them free." But Secretary LeBlanc has also admitted that not a single employee over this time period suffered any kind of discipline whatsoever.

As a result of the complete lack of accountability, the overdetention pattern continues to the present day. The Department of Corrections estimated that in February 2019, "231 people across the state were affected. Those people waited an average 44 days to be released after a judge ordered them free."[1] That is more than **334 years** of illegal imprisonment per year.

No other state, to the knowledge of undersigned, has a problem like this. One court did a wide-ranging survey and was:

> [U]nable to find any case, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible.

*Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005) (emphasis in original);

In Louisiana, it is not "days" – it is months or years.

This must end.

This Court should grant summary judgment. The parties can then move on to finding solutions to this horrifying problem.

---

[1] Emily Lane and Richard Webster, *Edwards, prison officials pledge fix to stop people being detained past their release date*. Times-Picayune (March 28, 2019).

## II.     STATEMENT OF FACTS

On January 25, 2013, Mr. Thomas plead guilty to three criminal charges. Judge Marullo of the Orleans Criminal District Court sentenced Mr. Thomas to:

- Five years for sexual malfeasance;
- Two years for sexual battery; and
- Five years for second degree kidnapping.

Statement of Material Facts (SMF) at 1; R. Doc 46 (Answer) at ¶ 3.

All charges were to be served concurrently, with credit for time served. The sentence was correctly recorded on a Sentence of Court form signed by Judge Marullo, transcribed by a court reporter, and entered into the minutes of court. SMF at 2; R. Doc. 46 at ¶ 4.

For the next two years, Mr. Thomas served his sentence at the David Wade Correctional Center. He took classes in prison and earned good time credit. SMF at 3; R. Doc. 46 at ¶ 5. Two of his charges (malfeasance and kidnapping, but not sexual battery) were eligible for sentence reductions based on the classes and good time credit. *Id.* Accordingly, the DOC calculated that he was entitled to be released on **June 5, 2015**. *Id.* By that date, Mr. Thomas would have completed the entirety of the full two-year sentence for his sexual battery charge, and would be eligible for release on the other charges. SMF at 4; R. Doc. 46 at ¶ 6. For that reason, June 5, 2015 was entered into his master prison record as his anticipated release date, which all parties agree was his "correct release date." SMF at 13; R. Doc. 46 at ¶ 80.

But in 2015, shortly before he was due to be released, Sally Gryder reviewed his records again. Ex. A at 54. Ms. Gryder was a Records Department Clerk at David Wade Correctional Center, and it was her job to calculate release dates. Ex. A at 20.

She noticed that the sequence for the three charges for Mr. Thomas varied between his Bill of Information and the Sentence of the Court. Ex. G at Int. 19. This should not have been an issue, because as Ms. Gryder testified, there is "literally nothing, no rule, no policy that says the order of the counts in

3

the Bill of Information has to match the order of the counts in the judge's Sentencing Order." Ex. A at 48. But nevertheless, Ms. Gryder reached out to the District Attorney's office for "clarification" of Mr. Thomas' sentence. Ex. A at 60. She sought "clarification" even though the judge's sentence was a "clear order." *Id*.

The District Attorney then asked the court for a status hearing. At the status hearing, the Clerk of Court changed the minute entry from two years for sexual battery to five years. Mr. Thomas was not present.

Then, because sexual battery is not entitled to good time credit, Ms. Gryder told Mr. Thomas that he would not be released until **February 28, 2017**. SMF at 6; R. Doc. 46 at ¶ 9. On June 26, 2015, Ms. Gryder sent De'Juan a letter, stating: "You are now serving your time flat and will full-term out on 02.28.2017. You do not have the option to refuse to release." SMF at 10; R. Doc. 46 at ¶ 45.

Mr. Thomas was distraught. But as a former military and law enforcement officer, he set out to methodically address the situation. He filed a motion with the Criminal District Court to correct the erroneous minute entry. Judge Bosworth issued an order saying that "The defendant's assertions are correct with regard to his sentence" and that the minute order had been corrected. SMF at 7; R. Doc. 46 at ¶ 12. That did not result in Mr. Thomas' release. Next, he obtained transcript of his sentencing, in which Judge Marullo stated "As to the sexual battery, sentence the defendant to two (2) years in the Department of Corrections, credit for time served." This transcript finally convinced Defendants in early December 2016 that Mr. Thomas should be released. Ex. A at 78.

Even after they realized that Mr. Thomas was past his release date, it still took more than a month for them to actually release him. Mr. Thomas was finally released on January 13, 2017 (SMF at 8), 589 days past his legal release date.

### III.  ANALYSIS

A.  **Standard for Summary Judgment**

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).

B.  **Because "There is a Clearly Established Right to Timely Release from Prison," a prison officer who acts "causelessly" or "recklessly" with regard to that right will be held liable.**

It is clearly established that the Due Process clause of the Fourteenth Amendment is violated by detaining a person after the legal authority to hold him no longer exists. *See, e.g., Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (state action restraining an individual's liberty in excess of a sentence gives rise to the protection of the Due Process Clause of its own force); *Terry v. Hubert*, 609 F.3d 757, 763 (5th Cir. 2010) ("[T]he due process clause is implicated in cases of continued incarceration . . . beyond the term of a court-ordered sentence[] . . . ."); *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) (detention past expiration of sentence "constitutes a deprivation of due process").

It is literally black-letter law: in 2011, the Fifth Circuit bolded andcapitalized a section header to emphasize that **"There is a Clearly Established Right to Timely Release from Prison."** *Porter v. Epps,* 659 F.3d 440, 445 (5th Cir. 2011) (emphasis in original.). The law is so well established that one court did a wide-ranging survey and found:

> The Court has been unable to find any case, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible.

*Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005) (emphasis in original); *see also Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour

5

horizon set out in *McLaughlin*. . . . [E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment.")

To hold an involved individual like Sally Gryder liable, a plaintiff must show that the official acted with deliberate indifference. *Porter, supra*, 659 F.3d at 446. A defendant acts with deliberate indifference if she acts "causelessly" or "recklessly," (*Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)), or with disregard for "a known or obvious consequence of [her] action" (*Porter* at 447). The deliberate indifference standard is more attainable in the context of overdetention than some other contexts, because in "a case such as this one, where there is no discretion and relatively little time pressure, the jailer will be held to a high level of reasonableness as to his own actions." *Bryan v. Jones*, 530 F.2d 1210, 1215 (5th Cir. 1976) (*en banc*).

**C.    Summary judgment should be granted against Sally Gryder for two reasons: first, because she causelessly sought "clarification" of a "clear order," and second, because she violated DOC policy in relying on a minute entry over a judge-signed sentencing order.**

Defendant Sally Gryder works for the Department of Corrections. She is one of two people at the David Wade Correctional Center responsible for calculating inmate release dates. Ex. A at 20.

Ms. Gryder has an explanation for why De'Juan Thomas was held for 589 days past his release date. According to Ms. Gryder, shortly before Mr. Thomas was to be released, she went over his paperwork to double check the accuracy of his release date. Ex. A at 54. She looked at the Sentencing Order for Mr. Thomas, and testified that it was "clear." Ex. A at 55

But even though Mr. Thomas' sentence was "clear," she says she then "found a discrepancy between the Bill of Information and the Sentence of the Court." Ex. G at Int. 19.  Specifically, she found that the District Attorney listed sexual battery as Count 3 in the Bill of Information, but the judge listed that charge as Count 2 in the judge-signed sentencing order. Ex. A at 53. Based on this mismatch, Ms. Gryder then contacted the District Attorney's office, who had the court enter an amended minute entry changing Mr. Thomas' sentence. Then, on the basis of that amended minute entry (which conflicted with the signed sentencing order of the court), Ms. Gryder changed Mr. Thomas' release date to February 28,

6

2017. *Id.* at 53-54.

That is Ms. Gryder's explanation. Taking it as true, it establishes that she acted with deliberate indifference for two reasons. First, Ms. Gryder's own testimony establishes that she acted "causelessly," in that there was literally no cause for her to take the steps she did. And second, her own testimony establishes that she violated DOC policy in taking the word of a minute entry over a sentencing order signed by a judge.

1. <u>Ms. Gryder acted with deliberate indifference in causelessly seeking "clarification" of a clear order, and in causelessly seeking to resolve a mismatch when "literally nothing" required a match.</u>

A prison official acts with deliberate indifference if she acts "causelessly" in a way that results in a constitutional deprivation. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) (deliberate indifference means "wantonly," and "[w]antonly means causelessly, without restraint, and in reckless disregard of the rights of others."), *quoting Smith v. Wade*, 461 U.S. 30, 39 n. 8 (1983).

Here, Ms. Gryder testified that she sought "clarification" because there was a mismatch between the sequence of crimes on the DA's Bill of Information and the court's Sentencing Order. Ex. G at Int. 19, Ex. A at 53. At deposition, she was crystal clear that <u>absolutely nothing</u> requires the Bill of Information to match the Sentencing Order. She testified that:

> Q. There's **literally nothing**, no rule, no policy that says the order of the counts in the Bill of Information has to match the order of the counts in the judge's Sentencing Order, correct?
> A. Correct.
> Q. Okay. So if those two things don't match, it's no indication that there's been a violation of a rule or a policy or anything like that?
> A. No. . . .
> Q. So the only thing to suggest to you that there was any discrepancy here was your belief that the judge's Sentencing Order should match the Bill of Information; is that right?
> A. That was my concern, to make sure that the counts were listed correctly.
> Q. But you had no basis for that concern except your own belief that those two should match, right?
> A. Correct.

Ex. A at 48, 58-50 (emphasis added).

7

Similarly, Ms. Gryder did not point to anything that made the judge's order ambiguous, and conceded that it was "clear." But despite the clarity of the order, she admits she still sought "clarification":

> Q. [W]e've established this order is clear --
> A. Correct.
> Q. And you needed clarification?
> A. Correct.
> Q. So you needed clarification for a clear order?
> A. Correct.

Ex. A at 60.

The Fifth Circuit has held that acting "causelessly" is deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Here, Ms. Gryder was <u>by definition</u> acting causelessly in her efforts to resolve a mismatch between two documents that did not have to match. And she was <u>by definition</u> acting causelessly in her efforts to seek "clarification" of a "clear order." Accordingly, Ms. Gryder, acted with deliberate indifference, and should be held liable for Mr. Thomas' resulting overdetention.[2]

2. <u>Sally Gryder acted with deliberate indifference when she violated DOC procedure in allowing a clerk's minute order to take precedence over a signed order of the court.</u>

At deposition, Ms. Gryder testified that she is to calculate inmate sentences "based on the rules and policies provided by the law and the Department of Corrections." Ex. A at 25. According to her, she was not prone to making mistakes. Ex. A at 40. By the time she calculated Mr. Thomas' sentence, she had been doing the job for more than a decade (Ex. A at 39), and couldn't recall a single instance where she had made a "mistake that led to an inmate being held longer than he should have been" (*id*. at 40). Accordingly, she testified that if she "were to deviate from these rules and policies, that would be a **deliberate choice**." *Id*. at 33 (emphasis added).

Here, Ms. Gryder deviated from DOC rules and policies. She testified that "an order from the

---

[2] Ms. Gryder almost certainly will not personally have to pay the judgment. Louisiana generally provides for the indemnification of its employees. *See* La. R.S. 13:5108.1.

8

court is the thing that's controlling" in conducting time calculations. Ex. A at 47. She agreed that a "judge's signed Sentencing Order controls over the minutes." *Id.* at 66. This was confirmed by her supervisor, Brenda Acklin, who testified that "if you've got a signed order by a judge and a Docket Master minute entry, the signed order by the judge controls." Ex. H at 23. *See also Robertson v. Lafayette Ins. Co.*, 2011-CA-0975, fn. 2 (La. App. 4th, Feb. 8, 2012) (minute clerks generally have no legal authority to sign orders).

But when Ms. Gryder extended Mr. Thomas' sentence by a year and a half, she was reversing the policy – allowing *minutes* to control over a *sentencing order*. *See* Ex. A at 65 (minutes said 5 years; signed Sentencing Order said 2 years); *see also id.* at 67 ("Q. And when you said that he got five year for sexual battery, you were basing that on the Docket Master minutes? A. On the amended court minutes, yes.")

Accordingly, by making a "deliberate choice" to reverse DOC policy in a way that resulted in Mr. Thomas' year-and-a-half overdetention, Ms. Gryder acted with deliberate indifference. *See, e.g., Bucano v. Austin*, 15-cv-67 (W.D. Pa., Feb. 12, 2016) (violation of policy can show deliberate indifference). The motion should therefore be granted as to Ms. Gryder.

**D.  Summary judgement should issue because the DOC has investigated and admitted that it has been overdetaining <u>hundreds of inmates per month</u>, more than sufficient to hold LeBlanc and Goodwin liable under *Monell/Hinojosa*.**

Black letter law holds that there is no *respondeat superior* liability in a § 1983 lawsuit. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009). The doctrine of *Monell* is a gloss on that rule: when the "persistent, widespread practice of officials or employees" is "so common and well-settled as to constitute a custom," it is imputed to the policymaker. *Webster v. City of Houston*, 735 F. 2d 838 (5th Cir. 1984). For that reason, if a plaintiff can show a pattern, they do not need to show that policymakers knew about a particular plaintiff's situation. Prison officials cannot escape liability "by arguing that, while they allegedly were aware of and consciously disregarded a substantial risk of serious harm to a discrete class of vulnerable inmates, they were not aware that the particular inmate involved in the case

9

belonged to that class." *Hinojosa v. Livingston*, 807 F. 3d 657, 667 (5th Cir.), *citing Farmer*, 511 U.S. at 843. *See also Ruiz v. Estelle,* 679 F. 2d 1115, 1155 (5th Cir. 1982) ("The evidence was sufficient to warrant the inference drawn by the district court that, although the disruptive policies he found were not formally sanctioned, they occurred so frequently and were so pervasive that they reflected a pattern of misconduct.")

This Court summarized it thus: a plaintiff can "point to a persistent and widespread practice[] of municipal [or state] officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Hacker v. Cain*, 14-cv-63, R. Doc. 170 (M.D. La., June 6, 2016.)

As few as four examples can establish a pattern sufficient for *Monell/Hinojosa* liability. *Barr v. City of San Antonio*, No. 06-CV-261, 2006 U.S. Dist. LEXIS 59402, at *12 (W.D. Tex. July 25, 2006) (finding that a pattern was alleged by citing four prior similar lawsuits over unlawful arrests and use of excessive force); *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (must be more than three).

Here, however, there are far more than four examples – the DOC admits that it has continues to find *hundreds* of examples of overdetention *per month.* And Defendants and their counsel have repeatedly and publicly conceded that this is a recurring problem. These examples and concessions are enough to establish Plaintiff's *Monell/Hinojosa* claim.

1. <u>In a series of studies and investigations, the Louisiana DOC found it was overdetaining hundreds of inmates *per month.*</u>

In 2012, the Louisiana DOC had a team of a dozen of its staff perform a "Lean Six Sigma"[3] review of its inmate time calculation processes. Ex. I. Secretary James LeBlanc was one of the three "champions" of the project. *Id.* at 3. The Lean Six Sigma review found that as of January 2012, the DOC had a "1446 backlog of cases to have time computed," resulting in an average processing delay of 110

---

[3] "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, *Lean Six Sigma*, Investopedia.com (Feb. 5, 2018).

days. *Id*. at 4. And once those inmates had their time finally calculated, more than 83% of them were eligible for "immediate release upon processing . . . due to an earlier release date." *Id.* As a result, the team found that in May 2012, there was an average of 71.7 "Overdue days" for inmates eligible for immediate release. *Id.* at 17. Interventions by the Lean Six Sigma team reduced, but did not eliminate the problem. After their interventions, the "average # of days each Immediate Release is past their release date" was reduced from 71.7 to 60.52 days. *Id.* at 18. The team estimated that if the overdue time could be cut in half, it would save the state $3.7 million dollars per year. *Id*. at 19. This establishes that "policymakers had actual or constructive knowledge" of the problem prior to Mr. Thomas' detention.

And despite the cost savings, the DOC did not fix the overdetention problem. In October 2017, the Louisiana Legislative Auditor released a report detailing an audit it had conducted into the DOC. The report was entitled "Management of Offender Data: Processes for Ensuring Accuracy." The Auditor found a number of problems, including basic data errors at a rate of 26 errors per 100 inmates. *Id*. at 10. Ex. J. Compounding this, the Auditor found that the "DOC's process for calculating offender release dates is inconsistent, which can result in errors." *Id*. at 7. As a result, the Auditor found that "an offender could be held too long if the release date was miscalculated and not caught until shortly before release." *Id*. at 13. For example, the Auditor "asked two DOC staff to calculate release dates on the same offender, and each staff used a different method to calculate the release date. The two results differed by 186 days." *Id*. at 13 (emphasis added).

The DOC did its own investigation that year and came up with an enormously disturbing result: "In 2017, DPS&C had an average of **200 cases per month** considered an 'immediate release' due to these deficiencies." Ex. K at 4 (emphasis added). The DOC concluded that this pattern of overdetention was costing the state "$2.8M per year in housing costs alone." *Id*.

Thus, we know that policymakers "failed to correct" the problem that they identified in 2012.

2. <u>Defendants and their counsel have repeatedly and publicly admitted an overdetention problem</u>.

While Defendants have denied a pattern of overdetention in court, they and their counsel have

11

admitted it repeatedly in public. On March 8, 2018, counsel for Defendants, Attorney General Jeff Landry, wrote an op-ed in the Advocate, stating that:

> Officials at the Louisiana Department of Corrections and Public Safety are too intent on covering up their own misdeeds to ensure public safety. . . . Underneath all of that is a layer of incompetence so deep that **the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison**.

Sen. John Kennedy and Atty. Gen. Jeff Landry, *Criminal justice reform actually hurting public safety*, The Advocate (Mar. 8, 2018) (emphasis added). Similarly, DOC spokesman Ken Pastorick recently said of the overdetention problem: "We know that there is an issue here and we want to solve it," said DOC spokesman. Emily Lane and Richard Webster, *Edwards, prison officials pledge fix to stop people being detained past their release date*. Times-Picayune (March 28, 2019).

3. <u>The DOC's pattern of overdetention continues to affect hundreds of people per month, without a single example of "discipline or adverse employment activity" in nearly two decades.</u>

Despite all this, Secretary LeBlanc admitted that there has *not been a single example of* "discipline or adverse employment activity for DOC employees who have incorrectly computed sentences or release dates, from 2000 to the present." Ex. E at Int. 4.

As a result, the problem continues to the current day. In February 2019, according general counsel for the Department of Corrections, "231 people across the state were affected. Those people waited an average 44 days to be released after a judge ordered them free." Emily Lane and Richard Webster, *Edwards, prison officials pledge fix to stop people being detained past their release date*. Times-Picayune (March 28, 2019).

If that rate is typical, the State of Louisiana is taking away **334 years** of its residents' freedom even after "a judge ordered them free" – every year. That is intolerable in a society that values the rule of law.[4] <u>It must end</u>.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court grant the motion for summary judgment.

                                              Respectfully submitted,

/s/ William Most_____
WILLIAM MOST, La. Bar No. 36914
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023
Email: williammost@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2019, a copy of *Memorandum in Support of Motion for Summary Judgment* was filed electronically with the Clerk of Court via the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

     /s/William Most\_
     William Most

---

[4] *See Powell, supra*, 376 F. Supp. 2d at 1354 ("The Court has been unable to find *any* case . . . in which the detainment of a properly identified individual for days beyond his scheduled release date was held constitutionally permissible.")