UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DE'JUAN THOMAS                          )

VERSUS                          NO. 3:17-CV-01595-SDD-EWD

SALLY GRYDER, JAMES LEBLANC,          )
JERRY GOODWIN, DOES 1-10              )


DEPOSITION OF:

SALLY GRYDER

NOVEMBER 14, 2018
(BEGINNING AT 9:40 A.M.)

TAKEN AT THE DAVID WADE CORRECTIONAL CENTER, 670 BELL HILL
ROAD, HOMER, LOUISIANA, ON BEHALF OF THE PLAINTIFF.


REPORTED BY:
LORRIE JOLES
CERTIFIED COURT REPORTER
NO. 91185
STATE OF LOUISIANA

1   APPEARANCES:

2

3        FOR THE PLAINTIFF:

4            William Most
             Attorney at Law
5            201 St. Charles Avenue, Suite 114, #101
             New Orleans, Louisiana  70170
6

7

8        FOR THE DEFENDANTS:

9            Attorney General Jeff Landry
             James Evans
10           Assistant Attorney General
             Litigation Division
11           Post Office Box 94005
             Baton Rouge, Louisiana  70804
12

13

14
         ALSO PRESENT:  Warden Jerry Goodwin
15

16

17

18

19

20

21

22

23

24

25

1                           STIPULATION

2

3           This deposition is being taken pursuant to notice

4    to all counsel for all purposes as authorized by the Federal

5    Rules of Civil Procedure.

6           All objections are reserved until the time of

7    trial in this matter except those to the form of the

8    question and responsiveness of the answer.  All formalities

9    in connection with the taking of the deposition are waived

10   with the exception of the swearing of the witness and the

11   reduction of questions and answers into a typewritten

12   transcript of these proceedings.

13          The witness reserves the right to read and sign

14   the transcript of his/her deposition.

15

16

17

18

19

20

21

22

23

24

25

1                          SALLY GRYDER

2    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

3                         MR. MOST:  Before we get

4                         started, can we stipulate that

5                         the deposition was properly

6                         noticed and that the court

7                         reporter is qualified?

8                         MR. EVANS:  That will be fine.

9                          EXAMINATION

10   BY MR. MOST:

11        Q    Ms. Gryder, my name is William Most.  I'm

12   the lawyer for the plaintiff in this case and I'll

13   just ask you to start by saying your name and title.

14        A    Okay.  Sally Gryder.  I'm ARDC Supervisor.

15        Q    What does ARDC stand for?

16        A    Adult Reception and Diagnostic Center.

17        Q    Ms. Gryder, have you ever given a

18   deposition before?

19        A    No.

20        Q    So a deposition - you just swore an oath

21   to tell the truth.

22        A    Correct.

23        Q    Do you understand that your answers here

24   today have the same force as if we were in a

25   courtroom with a judge and jury?

1      A    Correct.

2      Q    Is there anything that will prevent you

3  today from giving your full attention or truthful

4  answers?

5      A    No.

6      Q    Are you taking any medications or

7  suffering from any illness that would prevent you

8  from understanding my questions or answering them

9  fully and truthfully?

10     A    No.

11     Q    And one thing, I go over this in every

12  deposition, is a deposition is kind of like a

13  conversation, but there's certain ways in which it's

14  different than a conversation.  One of them is that

15  the court reporter is keeping a transcript and so it

16  helps to create a clean transcript if you wait until

17  I'm done with the question --

18     A    Okay.

19     Q    -- before answering.

20     A    Okay.

21     Q    And then I will wait until you're done

22  with your answer before I ask the next question.

23     A    Okay.

24     Q    Another way it's different is that, in

25  normal conversation, we may nod our head or shake

1  our head to mean yes or not, but, here, we'll have

2  to say yes or no out loud so that it can be

3  transcribed.

4      A    Okay.

5      Q    And there's no reason this has to be all

6  through start to finish.  We can take breaks.

7      A    Okay.

8      Q    So any time you feel like you need to take

9  a break to get some coffee, use the restroom,

10  anything, just let me or Gary know.

11      A    Okay.

12      Q    If you don't understand a question I ask,

13  will you please ask me to rephrase it so that you

14  can understand it?

15      A    Okay.

16      Q    Ms. Gryder, do you know what case you're

17  here for today?

18      A    Yes, I do.

19      Q    What case is that?

20      A    De'Juan Thomas versus Sally Gryder.

21      Q    When were you informed that you would be

22  doing this deposition?

23      A    I received an email.  I don't recall the

24  date, but I got an email from the Attorney General's

25  Office saying I would be deposed.

1    Q    And when did you start preparing for the

2  deposition?

3    A    I've been prepared.  I don't know how to

4  answer that any other way.  I just recall the events

5  of the case.  And so when you say prepare, what

6  exactly do you mean?

7    Q    Have you talked to anybody about this case

8  to prepare for this deposition?

9    A    Not other than my attorney here yesterday.

10   Q    Have you looked at any documents to

11 prepare for this deposition?

12   A    I did.  I went over the complaint last

13 weekend.  I went over the complaint and went through

14 that as far as - and that's about it.

15   Q    Besides the complaint, did you look at any

16 documents to prepare for this deposition?

17   A    I think I went over - probably reviewed

18 the court minutes and the Bill of Information and

19 that was probably the - you know, the extent of it.

20   Q    In addition to the complaint, the court

21 minutes and the Bill of Information, did you look at

22 any documents to prepare for this deposition?

23   A    Not that I recall.

24   Q    And in addition to your lawyer, did you

25 talk to Brenda Acklin, Jesse Jimerson, Warden

1  Goodwin --

2      A    I have not - I've never discussed the case

3  with Jesse Jimerson and Brenda and I have not gone

4  in depth on anything.

5      Q    Have you talked to Brenda Acklin about

6  this case not in depth?

7      A    We've mentioned - made mention of it.

8      Q    Since the case was filed?

9      A    Yes, uh-huh.

10     Q    What did you make mention of with Brenda

11 Acklin?

12     A    Just the time line, you know, the

13 occurrence, what happened and that - I mean, we

14 didn't go over any documents together or anything to

15 that nature, but just discussing the case in

16 general, so...

17     Q    Did you talk to Brenda Acklin after the

18 case was filed about anything other than the time

19 line?

20     A    I don't believe so.

21     Q    Okay.  When did you first find out about

22 this case, De'Juan Thomas v. Sally Gryder?

23     A    I think - I believe I was served in - was

24 it January?  Whenever the case was originally filed,

25 I received a copy of it and that was my first

1  notice.

2      Q    What did you do with the copy of it once

3  you received it?

4      A    I still have it.

5      Q    Did you give a copy of the complaint to

6  anybody else?

7      A    Probably Shannon, if anybody.  Shannon

8  handles our legal and she may - I may have given her

9  a copy of it.  I'm not sure.  I don't recall.  It's

10 been a while.

11     Q    Is that Shannon Bordelon?

12     A    That's Shannon Bordelon.

13     Q    And she's someone who works here at the --

14     A    Yes.

15     Q    She's not a member of the Attorney

16 General's Office?

17     A    No.

18     Q    Did you ask for a lawyer to represent you

19 in this case?

20     A    No.

21     Q    Did you receive a lawyer to represent you

22 in this case?

23     A    Did I receive a lawyer?  Through the

24 Attorney General's Office, I was notified of who my

25 attorney would be.

1    Q    But you didn't ask the Attorney General --

2    A    No, no.

3    Q    Okay.  I'll finish my question.  You

4    didn't ask the Attorney General for a lawyer?

5    A    No.

6    Q    Or for representation in this case?

7    A    No.

8    Q    So Ms. Gryder, I'll ask you again what

9    your title is?

10   A    It is ARDC Supervisor.

11   Q    And you said what ARDC stands for, but,

12   again, would you repeat it one more time?

13   A    It's Adult Reception and Diagnostic

14   Center.

15   Q    What is the Adult Reception and Diagnostic

16   Center?

17   A    Where like the offenders that are first

18   sentenced, they go through - if they're housed, you

19   know, in a - or transferred to a state facility from

20   a parish, then they go through Adult Reception, or

21   ARDC or WRDC or HRDC is at Hunt and they are

22   classified - that's where they are classified.

23   Q    Is that another word for the

24   Classifications Department or is it part of the

25   Classifications Department?

1      A     Not to my knowledge.  It's Classification,

2  you know, they go - Classification Department, to my

3  knowledge, is the ones that actually classify along

4  with mental health and medical.

5      Q     Okay.  So ARDC --

6      A     Yes, it's a joint, I guess you could say.

7  Several departments are involved in classifying an

8  offender.

9      Q     So ARDC is a separate department from

10  Classification?

11      A     It's just a title.  I'm not - I don't

12  know.  It's just a title.  That's what I've always

13  been told what it stood for and...

14      Q     Okay.  And so we get a sense of where it

15  fits in, who do you report to?

16      A     I report to Brenda Acklin directly.

17      Q     And who does Ms. Acklin report to?

18      A     Warden Huff, Warden Angie Huff.

19      Q     Is Warden Huff a warden here at David

20  Wade?

21      A     Yes.

22      Q     And who does Warden Huff report?

23      A     Warden Goodwin.

24      Q     And who does Warden Goodwin report to?

25      A     Secretary LaBlanc.

1    Q    So the ARDC is a department here at David

2   Wade that handles paperwork of inmates?

3    A    The Records Office - well, several

4   departments handle the paperwork of offenders.  The

5   ARDC is just - like a said, a title.  It's a civil

6   service title.  When I came to work here, I was

7   classified as an ARDC Specialist until I became a

8   supervisor, so...

9    Q    Do you work within the Records Department?

10    A    Yes.

11    Q    And people within the Records Department,

12   they don't just hold the records, they're also

13   responsible for calculating inmate time and tasks

14   like that; is that right?

15    A    Correct.

16    Q    What do you do in your job as a ARDC

17   Supervisor?

18    A    I supervise the other employees in the

19   Records Office outside of Brenda and I supervise the

20   employees in the pre-class - our Pre-class

21   Department here at Wade.  I do check records for

22   releases.  Brenda and I both - one of us has to sign

23   off on all releases.  I sign off on all the Wade

24   releases.  She and I both share duties in checking

25   and signing off on the pre-class, or the parish

1    facility offenders.

2        Q     What does pre-class mean?

3        A     Pre-classification.  It's where - it's

4    considered when they're - when an offender is

5    originally sentenced, then the pre-classes are the

6    paperwork, the court documents and other documents

7    that are needed to calculate an offender's time.

8        Q     So my understanding is a judge may say a

9    sentence of certain years, but it still takes some

10   calculating to figure out their release date,

11   because you need to know things like how much time

12   they spent pre-trial, things like that; is that

13   right?

14       A     Correct.

15       Q     So that's part of the pre-class process?

16       A     Correct.

17       Q     And so that's part of your role as the

18   ARDC Supervisor --

19       A     Correct.

20       Q     And it's a little tricky, but just - if

21   you'll wait until I'm completely finished, --

22       A     Okay.

23       Q     -- then it easier for her to do --

24       A     Okay.

25       Q     -- her job.  It's a very normal thing for

1  people's first deposition to get used to. (SIC)  Ms.

2  Gryder, could you give me the nutshell version of

3  your educational and professional history?

4      A     I completed twelve years of high school.

5  I completed one semester of college and I completed

6  a business course.

7      Q     Where did you do your college?

8      A     Centenary College in Shreveport.

9      Q     And where did you do your business school?

10     A     Ayers School of Business, Shreveport.

11                     MR. EVANS:  I'm sorry.  Just for

12                     the record, could you spell

13                     that, just for the court

14                     reporter?

15     A     A-Y-E-R-S.

16     Q     How long have you worked for the

17 Department of Corrections?

18     A     Since 9/11/2001.

19     Q     Okay.  What did you do before you came to

20 the Department of Corrections?

21     A     My husband and I owned a business.

22     Q     What was your business?

23     A     It was a mobile home dealership.

24     Q     So in 2001, you came to work for the

25 Department of Corrections?

1    A    Correct.

2    Q    What was your first job at the Department

3  of Corrections?

4    A    I worked in - I was hired to work in

5  inmate banking, which is now called offender

6  banking.

7    Q    How long did you do that for?

8    A    Until March of 2003 when I moved into the

9  Records Office.

10    Q    Have you been in the Records Office

11  continuously from 2003 to the present?

12    A    Yes.

13    Q    Have you spent that entire time at the

14  David Wade Correctional Center Records Department?

15    A    Yes.

16    Q    What different roles have you had within

17  the Records Department from 2003 to the present?

18    A    I was ARDC Specialist.

19    Q    And then at some point, you were promoted

20  to ARDC Supervisor?

21    A    Correct.

22    Q    When did that happen?

23    A    August of '17, I believe it was, or

24  September.

25    Q    So you were an ARDC Specialist for about

1  fourteen years and then you've been an ARDC

2  Supervisor for --

3        A    For about --

4        Q    -- a little more than a year?

5        A    Correct.

6        Q    And that promotion from specialist to

7  supervisor in August 2017, is that something that

8  happened automatically or it was a discretionary

9  promotion based on your --

10       A    It's discretionary, I guess you would say,

11  yes.  It's not - it wasn't automatic.  I had to

12  apply for it.

13       Q    And who made the decision to promote you

14  to supervisor?

15       A    Warden Goodwin, I believe.  I can't answer

16  that.  You'd have to ask him.

17       Q    Does the David Wade Records Department

18  only handle inmates at David Wade or a bunch of

19  different prisons?

20       A    Only at David Wade, other than the

21  Pre-class Department.  That's here.  That's a

22  separate department that handles parish offenders.

23       Q    Okay.  So Records Department and Pre-class

24  are separate departments?

25       A    Yes.

1    Q    And Records Department handles just David

2  Wade inmates?

3    A    Just the Records Department here handles

4  David Wade, yes.

5    Q    The Pre-class Department handles David

6  Wade inmates and also inmates at parish facilities?

7    A    No.  Pre-class only handles parish

8  inmates.

9    Q    I see.  And from 2003 to the present,

10  you've been in the Records Department?

11    A    I've been in the Records Department.

12    Q    So from 2003 to the present, you've only

13  been handling David Wade inmates?

14    A    No.  Brenda and I supervise the Records

15  Office here and the Pre-class Department, so we

16  supervise the handling of David Wade offenders and

17  we supervise the handling of the parish facilities,

18  housed in the north.

19    Q    So currently both Records and Pre-class

20  report up to you and Brenda?

21    A    Correct.

22    Q    Was that true when you were an ARDC

23  Specialist as well?

24    A    No, I only handled Wade.

25    Q    So from 2003 to 2017, you were in the

1    Records Department handling David Wade inmates as an

2    ARDC Specialist, you got promoted in 2017 and now

3    you handle - you have people reporting up to you

4    from both Records Department and Pre-class

5    Department?

6         A    Correct.

7         Q    So the events we're talking about here

8    today, I believe, entirely while you were an ARDC

9    Specialist?

10        A    Correct.

11        Q    So as I ask questions about your job, I'm

12   going to be asking about your job when you were a

13   specialist, not a supervisor, unless I suggest

14   otherwise.  Will you understand that?

15        A    Yes.

16        Q    So in your job as ARDC Specialist, part of

17   your job was calculating inmate release dates and

18   inmate sentences; is that right?

19        A    Correct.

20        Q    Was that the entirety of your job?

21        A    No.

22        Q    What were the other parts of your job?

23        A    I scheduled court orders, handled

24   correspondence with the offenders, anything I was

25   called upon to do.

1    Q    What does it mean to schedule a court

2    order?

3    A    Offenders here are - they're writted into

4    court and I was the one that received the court

5    orders normally and schedule them, if we had to

6    transfer them, or scheduled them to go to court.

7    Q    I see.  So getting inmates to and from

8    their court appearances?

9    A    Correct.

10    Q    How many ARDC Specialists were there when

11    you were doing that job here at David Wade, were you

12    the only one?

13    A    In the Records Office.  Our Classification

14    Department also has ARDC Specialists that do a

15    different type of work.

16    Q    Okay.  So you were the only ARDC

17    Specialist in the Records Department?

18    A    Correct.

19    Q    Is that true for the entirety of your time

20    from 2003 to '17?

21    A    No, actually, at one point, we had a

22    Pre-class area that - position - Pre-class position

23    that was in the Records Office, but I didn't handle

24    that.  That was under Brenda, directly under her.

25    Q    Okay.

1     A    And that was just one person.

2     Q    So the time period we're talking about in

3 this case is roughly 2015 to the beginning of 2017,

4 right?

5     A    Correct.

6     Q    So during that time period, you were the

7 only ARDC Specialist in the Records Department --

8     A    Correct.

9     Q    -- of David Wade?  Was there anyone

10 besides you who was responsible for calculating

11 inmate release dates during that time period?

12     A    Brenda.

13     Q    Anyone besides you and Brenda?

14     A    No.

15     Q    What portion of your job was it to

16 calculate inmate release dates, was it a large

17 portion, a small portion?

18     A    Okay.  Initially, unless an offender here

19 got a supplemental sentence, then I would calculate

20 it.  Other than that, I checked their time to make

21 sure it was correct or made changes, you know, I do

22 that, added forfeiture of good time, if they

23 forfeited good time, if they earned CTRP credit, I

24 applied that.

25     Q    Were those tasks more than half of your

1    job or less than half?

2        A    Probably half of my job, I would say.

3        Q    Okay.  So when you were a specialist - you

4    were an ARDC Specialist, Brenda Acklin was your

5    supervisor, right?

6        A    Correct.

7        Q    Did you do all the initial calculations

8    and then it would get escalated to her sometimes or

9    would she sometimes do an initial calculation for

10   any reason?

11       A    She sometimes did calculations.

12       Q    And you had the ARDC Specialist job

13   starting in 2003 to 2017.  Did you receive training

14   for that job?

15       A    Hands-on with Brenda, underneath her.

16       Q    Did you receive anything more than

17   on-the-job training?

18       A    Occasionally, I went to Baton Rouge, I

19   believe twice, maybe, that we had training sessions

20   during that time, but other than that, I received it

21   from Brenda.

22       Q    So that was like classroom training in

23   Baton Rouge?

24       A    Just seminars for - like one-day seminars.

25       Q    Do you remember, roughly, when those were

1   in that --

2        A    I do not.

3        Q    Were they in the last ten years or so?

4        A    No.

5        Q    Okay.  So probably these one-day seminars,

6   the two of them, were maybe probably prior - or

7   probably prior to 2008?

8        A    Probably.

9        Q    Aside from those two one-day seminars, did

10  you receive any sort of classroom or online or any

11  sort of other training?

12       A    We get - we do a lot of things through

13  email.  We receive - periodically receive emails

14  concerning time computation and changes.

15       Q    How are those emails identified, is there

16  like a - do they say, memo, or do they say something

17  to indicate this is an update about time

18  calculation?

19       A    Yes, or - yes, it will be, you know, a

20  reference to a certain thing that has to deal with

21  time comp., whether it be CTRP credit, jail credit

22  or what, and we'd get up - we'd get updates on a

23  regular basis, usually.

24       Q    Is there something consistent about these

25  emails that helps you spot them?

1    A    Well, our emails come from Angela Griffin

2  most of the time.  She's our go-to person at

3  headquarters.

4    Q    I'm asking because I'm going to ask for

5  these emails from Gary and so I'm trying to figure

6  out how I should ask for them.  Like what can I ask

7  him for so that he can, you know, ask the DOC, these

8  are the emails I'm looking for that provide these

9  updates?  Is there a way to identify them?

10    A    No, not as a group, I wouldn't say.

11    Q    But he could ask Angela Griffin, give me

12  the updates emails and she would probably understand

13  what that means?

14    A    Correct.

15    Q    In addition to those two one-day seminars

16  and these update emails from Angela Griffin, have

17  you received any other sort of training about how to

18  do time calculation?

19    A    Not to my knowledge.

20    Q    So when you started this job in 2003, how

21  did you learn how to do time calculation?

22    A    Brenda Acklin.

23    Q    She would just tell you how to do it?

24    A    She would show me what I need to do and

25  through reading the manuals or whatever we had

1  available, you know, looking at - that's how I

2  learned, by doing.

3     Q    I want to just make sure that we're on the

4  same page about certain terms.  So when I say time

5  calculation or time computation - let me, actually,

6  rephrase that.  What do you mean when you say time

7  computation or time calculation?

8     A    Anything doing anything to the offender's

9  time - that would involve his dates, his release

10  dates, normally, I mean, that would be my definition

11  of time calculation, is affecting his release dates.

12     Q    Got it.  So time computation or time

13  calculation means taking everything into

14  consideration that's relevant, figuring out when

15  this inmate is supposed to get out of prison?

16     A    Correct.

17     Q    And the Department of Corrections has a

18  duty to timely release dates - I'm sorry.  Let me

19  start over.  Is it the Department of Correction's

20  duty to timely release inmates on their proper

21  release date?

22                    MR. EVANS:  Object to form, but

23                    you can answer.

24     A    Yes.

25     Q    The Department of Corrections is legally

1  bound to release inmates on their proper release

2  date; is that correct?

3              MR. EVANS:  Object to form.  You

4              can answer.

5      A    Yes.

6      Q    And when you calculate an inmate's release

7  date, you do it based on rules and policies provided

8  by the law and the Department of Corrections; is

9  that correct?

10     A    I'm sorry, repeat that.  I didn't

11  understand part of your question.

12     Q    Sure.  When you calculate an inmate's

13  release date, you do it based on the rules and

14  policies provided by the law and the Department of

15  Corrections; is that correct?

16     A    Correct.

17     Q    You can't make up the rules yourself,

18  correct --

19     A    No.

20     Q    So if a rule appears in the law or the

21  Department of Corrections or David Wade policies,

22  you apply that rule, correct?

23     A    Correct.

24     Q    And if something doesn't appear in that

25  law or Department of Corrections or David Wade

1   policies, you don't do it, correct?

2       A    Correct.

3       Q    So let's figure out what those rules and

4   policies are.

5       A    Okay.

6       Q    From your discovery responses we've got -

7   I've got them right here, so we'll just go through

8   them one at a time.

9       A    Okay.

10      Q    So we've got Department of Corrections

11  Regulation B-02-018.  Is that one of the documents

12  you look at?

13      A    No, I don't.  I mean, I - this is

14  basically the pre-class when an offender first comes

15  in, so his time has already been calculated when I

16  review his time.  I don't do the initial time

17  calculation for parish offenders.  Okay?  I'm

18  supervisor, but that's done by the ARDC Specialist

19  over the parish.

20      Q    Okay.  So B-02-018 is not relevant to

21  calculating inmate release dates here at David Wade?

22      A    Okay.  Let me rephrase my answer.

23      Q    Sure.

24      A    It is.  They have to have the paperwork.

25  The pre-class person, ARDC Specialist, handling that

1    offender's case goes by that.  They have to have the

2    proper paperwork in order to calculate that.  Now,

3    when it comes to me to check, it's already been

4    calculated.  Okay?

5        Q    Okay.

6        A    So I don't review the policy.  The policy

7    is used, yes, but I don't review the policy because

8    I don't do the initial calculations, as a rule, for

9    parish offenders.

10       Q    So this is in the universe of relevant

11    documents?

12       A    Yes.

13       Q    Okay.  And then we've got B-04-001.

14       A    Okay.

15       Q    Is that part of the relevant documents for

16    calculating inmates' --

17       A    Yes.

18       Q    -- release time?

19       A    Yes.

20       Q    We're going to create a stack here of

21    relevant documents.

22       A    Okay.

23       Q    B-04-004.

24       A    Okay.  That is - okay.  That has to do

25    with parole eligibility, yes.

1     Q   Okay.  So it goes on this stack.

2   B-04-006.

3     A   Restoration, yes, we use that.

4     Q   David Wade Correctional Center policy memo

5   03-05-02.

6     A   Yes, awarding good time, yes.

7     Q   David Wade Correctional Center policy memo

8   03-07-02.

9     A   Yes.

10    Q   Okay.

11              MR. EVANS:  And just for the

12              record, I'd just like to note

13              that Mr. Most has shown Ms.

14              Gryder each of those documents

15              that he's referencing.

16              MR. MOST:  Actually, we can -

17              can we go off the record for a

18              second?

19              MR. EVANS:  Sure.

20               (OFF THE RECORD)

21              MR. MOST:  B-04-001, I'm

22              labeling as Exhibit A.

23              B-02-018, I'm labeling as

24              Exhibit B.  B-04-006, labeling

25              as Exhibit C.  And 03-05-02, I'm

1            labeling as Exhibit D.

2            03-07-02, I'm labeling as

3            Exhibit E.  The only one I

4            forgot there is B-04-004, I'm

5            going to label as Exhibit F.

6        Q    And the final document you mention in your

7    discovery responses is time computation worksheets.

8    Is it this document that I'm showing you here, is

9    that what you were referring to?

10        A    Okay.  Worksheet - this is instructions

11   that we received from headquarters as an overview,

12   just an overview, but when I refer to - okay.  Time

13   computation worksheet is the actual - that shows the

14   jail credit.  Is that what you're referring to?

15        Q    Well, we'll look at your discovery

16   responses --

17        A    Okay.

18        Q    -- and that may be helpful, too.

19        A    Okay.

20            MR. MOST:  Do you have her

21            interrogatory responses right in

22            front of you?  I can pull it up

23            on my computer.  I thought I

24            brought it.

25            MR. EVANS:  Actually, they may

1          be on my computer as well.  I'll

2          check.  Yeah, I don't have a

3          hard copy of them.

4     Q    Okay.  So in your interrogatory responses,

5     the question was, identify all statutes,

6     regulations, policies, directives, guides and

7     manuals that govern your calculation of inmate

8     release dates, and you went through the six

9     documents we just went through, Exhibits A through

10    F, and then you said, see, also, the time

11    computation worksheets identified in Defendant's 1st

12    and 2nd Supplemental Responses to Request for

13    Productions of Documents.  When you say time

14    computation worksheets, do you mean things in CAJUN

15    or do you mean a physical document.

16    A    Okay.  And I - apparently we're speaking

17    of this, because this is a compilation of all the

18    documents we use and this is an overview that we

19    received from headquarters, so that's probably

20    what...

21    Q    Great.  So I'm going to label this Exhibit

22    G.

23    A    Okay.

24    Q    Exhibit G is what you were just pointing

25    to?

1    A    Yes.

2    Q    Okay.  And so this is the final document

3  in the universe of documents that is relevant to

4  calculating inmate release dates; is that right?

5    A    Right.

6    Q    Okay.  So we've now got here Exhibits A to

7  G.  This is the stack of rules and policies that

8  govern inmate release dates?

9    A    Yes.

10    Q    Is there anything that is not in this

11  stack that is relevant?

12    A    That we used to calculate?  We used the -

13  I often refer to their NCIC for information.

14    Q    I'm not asking about sort of the data

15  inputs.  I'm asking about the rules and policies

16  that --

17    A    Yes, that went in - yes, that comprised.

18    Q    So this stack, A to G, is the universe,

19  all rules and policies --

20    A    Yes.

21    Q    -- relevant to --

22    A    Yes.

23    Q    -- calculating inmate release dates?

24    A    Yes.

25    Q    Have you ever seen this document, which

1   I'm going to label Exhibit H?  This is nine pages of

2   a longer document.  It's entitled time computation.

3   Can you see that?

4        A    I do have a copy of this that I received

5   from my attorney.  This was done - I believe this

6   was done at headquarters that they use down there

7   that we didn't - we don't have.  I mean, we have the

8   information that's all contained on this document,

9   but as far as the specific document, I don't recall

10  ever having this document in my possession.

11       Q    Okay.  Prior to this lawsuit?

12       A    Correct.

13       Q    Okay.  So Exhibits A to G, this stack on

14  the table, this is everything that you use and

15  should just to calculate inmate release times?

16       A    Yes.

17       Q    Okay.  And you were an ARDC Specialist

18  from 2003 to 2017?

19       A    Correct.

20       Q    So you know these documents pretty well?

21       A    Yes.

22       Q    You know them backwards and forwards?

23       A    I wouldn't say that.

24       Q    Okay.

25       A    I don't memorize.

1     Q    You don't memorize.

2     A    A lot of my information is in my head.

3     Q    But you know them so well that you don't

4 have to look at them every time you calculate an --

5     A    No, I don't.

6     Q    -- inmate's release date?  And I'm just

7 going to do it again, so that we have a clean answer

8 and you can wait until I'm finished.

9     A    Okay.  Sorry.

10    Q    It's okay.  It's completely normal for a

11 first deposition to take some time to get adjusted

12 to that.  So, Ms. Gryder, you know these documents,

13 Exhibit A to G, so well that you don't have to look

14 at them each time you calculate an inmate's release

15 date; is that correct?

16    A    That's correct.

17    Q    Sometimes you don't look at them at all in

18 calculating an inmate's release date?

19    A    Correct.

20    Q    So if you were to deviate from these rules

21 and policies, that would be a deliberate choice,

22 correct?

23              MR. EVANS:  Object to form, but

24              you can answer.

25    A    I would have to say yes.

1    Q    Okay.  How long does it typically take you

2  to do a time calculation for an inmate, start to

3  finish?

4    A    It depends.  It depends on the sentence

5  dockets he has and I would say, if I had all the

6  information, like jail credit, Bill of Information,

7  court minutes, then probably fifteen minutes to

8  enter it and do the time calculation.  Just a simple

9  case.

10    Q    How did you get assigned - when you were

11  an ARDC specialist - and, again, we'll be talking

12  about your job as an ARDC Specialist, unless we say

13  otherwise, right?

14    A    Right.

15    Q    How would you get assigned an inmate to

16  calculate their release date?

17    A    I wasn't necessarily assigned.  I had

18  certain duties that I performed and that - like on

19  the releases, I handle the initial release

20  procedures, check them for release, or if they got a

21  supplemental paperwork and to add dockets, I added

22  the time comp and re-time-comp'ed them, so it wasn't

23  necessarily an assignment each time.

24    Q    So if an inmate - if something changed

25  about their situation, you would recalculate their

1  time?

2      A    Correct.

3      Q    And you would also recalculate their time

4  before they get released; is that right?

5      A    Yes, yes.

6      Q    So if an inmate is scheduled to be

7  released, then prior to that, you do sort of a

8  double check to confirm that that's their correct

9  release date?

10     A    Correct.

11     Q    Does that happen for all inmates at David

12  Wade?

13     A    Yes.

14     Q    In the course of your job, would you

15  sometimes find inmates who were eligible for

16  immediate release?

17     A    Yes.

18     Q    Would you find eligible - let me start

19  over.  Would you find inmates who were eligible for

20  immediate release because you realized that their

21  proper release date was in the past?

22     A    And offender - I mean, occasionally, I

23  would find - we'd find an error and maybe the jail

24  credit that was not getting all of his jail credit

25  or he had CTRP credit that needed to be applied that

1 would change - anything that would change his date.

2     Q    So sometimes you would find inmates who

3 should have been released some time ago?

4     A    Sometimes.  Very rarely.

5     Q    How often do you think you would find

6 this?

7     A    There's no percentage I could - well, it

8 would be very small.

9     Q    Would it be once a week?

10     A    No, no.

11     Q    Once a month?

12     A    No.

13     Q    Once a year?

14     A    Maybe once a year, twice a year.  Excuse

15 me, we are talking about Wade, David Wade?

16     Q    Right.

17     A    Okay.

18     Q    And that's a great point.  How many

19 inmates, approximately, are here at David Wade?

20     A    Twelve hundred, a little over twelve

21 hundred.

22     Q    So when you found someone who is eligible

23 for immediate release, because they should have been

24 released in the past, what would happen next?

25     A    I would - we would get his time

1  recalculated.  We would handle it in an expeditious

2  a manner as possible, get a Residence Plan, notify

3  Classification to give us a Residence Plan, order

4  and ID and go from there.  Get him processed out as

5  soon as we - as soon as we could.

6      Q    How long would that typically take?

7      A    It depended on his residence, if the

8  offender has a Residence Plan he could go to, and it

9  would depend on what type of release it was.

10  Full-term release, they did not - they do not have

11  to have an approved - or a Residence Plan.  They can

12  just go anywhere they wish to, basically, but if

13  it's a sex offender, that makes a difference, you

14  know, and we have to find - and we have offenders,

15  you know, that Classification has to find,

16  sometimes, some place for them to go, but, normally,

17  within a week, we're going to get them out.

18      Q    So if they already have an approved

19  Residence Plan, they're good to go, but if they

20  don't have an approved Residence Plan, they need to

21  get one --

22      A    They try to find a place for them to go.

23      Q    Okay.  So you think it took typically

24  about a week.  Is that if they need a Residence Plan

25  or if they've already got one?

1      A     And it would be less than a week.  If they

2    had a Residence Plan, everything was good to go,

3    then we could get them out.  I normally like to

4    process - like, today, and to release them tomorrow,

5    if they - you know, everything was the way it should

6    be.

7      Q     So if they got a Residence Plan and you

8    find out that they're eligible for immediate

9    release, they should have been released a while ago,

10   they should get out by tomorrow --

11     A     We get them out - or the next day, so...

12     Q     Tomorrow or the next day.  Okay.  And if

13   they don't have an approved Residence Plan and need

14   to get one, it might take about a week; is that

15   right?

16     A     It depends.  If they have to have an

17   approved Residence Plan - that depends on

18   Probation/Parole, because they're the ones that have

19   to approve the Residence Plan for sex offenders.

20     Q     Okay.  And that process, if they needed an

21   approved Residence Plan, would take typically about

22   a week; is that right?

23     A     It could take longer, depending on when we

24   get the approved plan back.

25     Q     Two weeks?

1    A    It could take - sometimes it could take

2    longer than that.  It's up to Probation/Parole.

3    They assign - they have to go out and look at the

4    residence and they assign the Residence Plan to an

5    agent, so - but, normally, probably two weeks,

6    maybe.  Normal course of things, they take longer

7    than that.  You'd have to talk to Classification to

8    see how far ahead they like - we're talking about -

9    now, you're just talking about immediate releases

10   right, okay, at this point?  They would send the

11   Residence Plan to P&P and it's up to them whenever

12   they send it back, approve it, or if they don't

13   approve it, they can't leave, if they're under

14   supervision.

15       Q    So you started this job in 2003 without

16   any formal training, it was just on-the-job

17   training?

18       A    Correct.

19       Q    Did you wind up making some mistakes early

20   on when you were learning on the job?

21       A    I don't recall.  I'm sure I probably did,

22   but I don't recall.

23       Q    Once you had had a couple of years

24   experience, talking maybe the time period around

25   2015, 2016, did you make mistakes in time

1   calculation?

2       A    Probably, based on what information I had

3   at the time.  Sometimes we don't have all the

4   information we need, so...

5       Q    Sometimes, even if you have all the

6   information, would you make mistakes?

7       A    I know time calculation pretty well and I

8   learned it, so I'd say I didn't make a lot of

9   mistakes in time - I don't believe I made a lot of

10  mistakes in time calculation.  I can't recall.

11      Q    You can't recall any time calculation

12  mistakes you made?

13      A    I can't recall offhand.

14      Q    Can you recall ever making a mistake that

15  led to an inmate being held longer than he should

16  have been?

17      A    I don't recall that.

18      Q    Can you recall anyone else in your office

19  making a mistake that led to an inmate being held

20  longer than he should have?

21      A    No.

22      Q    Did you sometimes, in your job doing time

23  calculation, come across a sentence issued by a

24  judge that you thought the judge had issued an

25  illegal sentence?

1    A    I don't recall an illegal sentence.

2    Q    For example, perhaps a judge gave credit

3  for time served for a previous crime than the one

4  the person was being sentenced for.

5    A    I have - we have had cases where they

6  ordered them to get credit for time served from a

7  specific date that was prior to the offense date of

8  the current - of the incident offense.

9    Q    And a judge isn't supposed to do that,

10  right?

11    A    That's up to the judge.  I wouldn't dare

12  make that call.

13    Q    So if a judge makes a call, you have to

14  follow it, you don't get to second-guess the judge?

15    A    We don't question the judge on when he

16  gives credit for time served.

17    Q    What about in other situations, do you

18  question the judge in other --

19    A    If we need clarification, if something is

20  not clear.

21    Q    But if a judge's order is clear, you don't

22  question it?

23    A    It depends.

24    Q    In what circumstances would you question a

25  judge's clear order?

1          A     If there's not - if there's a discrepancy

2     maybe in the minutes or the uniform - between the

3     minutes and the Uniform Commitment Order or in the

4     Bill of Information and the Sentencing Minutes or we

5     need clarification, I wouldn't hesitate to ask for

6     clarification.

7          Q     What is a Uniform Commitment Order?

8          A     That is an order where the sentence is

9     listed that's - it's called a Uniform Commitment

10    Order and it's supposed to be signed by the judge,

11    so - and it has the sentence length where - normally

12    whether it's to run concurrent or consecutive, just

13    the violent - pertinent information on the sentence.

14         Q     Is that also called a Sentencing Order?

15         A     No.

16         Q     Okay.  It's different than a Sentencing

17    Order?

18         A     That's different.

19         Q     So you might question a judge's clear

20    sentencing order, if it conflicts with the minutes

21    of the court, is that what you said?

22         A     If we get Sentencing Minutes, and we do,

23    that are not - where there's maybe a discrepancy or

24    it's not perfectly clear sometimes, then we ask for

25    clarification.  It's not questioning the judge, but

1    it's - sometimes the minutes are not clear.

2         Q    What about if the sentence itself is

3    clear, would you question the sentence in any

4    situation?

5         A    Yes.

6         Q    When would you question a clear sentence?

7         A    If there's a discrepancy, like I said,

8    between the Bill of Information and the Sentencing

9    Minutes in the way it's listed and it would make a

10   difference in the offender's time, --

11        Q    Okay.  So if there's --

12        A    -- then I would question it.

13        Q    So if there's a discrepancy between the

14   judge's sentence and the Bill of Information, that

15   would be a scenario in which you would question the

16   judge's sentence?

17        A    If it would have an effect on his time.

18        Q    Okay.  So where does it say that the Bill

19   of Information and a judge's Sentencing Order should

20   match --

21        A    I don't know that it says that.

22        Q    And let me just start over so it's clear.

23   Where does it say that a Bill of Information should

24   match a judge's sentencing order?

25        A    I have no idea.  I don't know that it does

1 say that, but most of them do.  Most minutes match -

2 when they list counts - start listing counts, the

3 counts match the Bill of Information in most cases.

4     Q    I'm pointing to the stack of documents

5 here, A to G, that we said was the universe of

6 relevant policies.  Does it say anywhere in here

7 that the Bill of Information should match the

8 Sentencing Order of the court?

9     A    I don't believe so.

10     Q    Is there an unwritten rule that it should

11 match - that the Bill of Information should match

12 the Sentencing Order?

13     A    No.

14     Q    Where did you get the idea that the Bill

15 of Information should match the Sentencing Order?

16     A    I read the Bill of Information and one os

17 his charges was sexual battery and sexual battery

18 does not earn good time.  In the minutes, sexual

19 battery was count three and because the minutes

20 listed counts one, count two, count two, and count

21 two was assigned to the sexual battery, I sought

22 clarification.  I decided I needed clarification.

23     Q    Yeah.  And you're talking about De'Juan

24 Thomas?

25     A    I am.

1      Q     Yeah.

2      A     I am.

3      Q     So let's set De'Juan Thomas aside for just

4   a moment.

5      A     Okay.

6      Q     I just want to talk about generally.

7      A     Okay.

8      Q     Does it say anywhere in this stack of

9   documents, A to G, which we agreed was the universe

10  of policies relevant to calculating time, that you

11  should look to the Bill of Information at all?

12     A     The Bill of Information is on that policy.

13  That's one of the pre-class documents that are

14  required.

15     Q     Okay.  Which policy are you talking about?

16     A     I believe it's B - the first - let's see.

17  What is the "B" - oh, the one about pre-class.  Is

18  it not in here?

19     Q     Maybe B-02-018?

20     A     B-02 - yes, that's one of the documents

21  that's required, but I don't see it in this, but

22  that's the number.  I believe it is.  There it is.

23  Okay.  That's identify - one of the documents that

24  they - they're supposed to have in sentencing court.

25     Q     Sure.  Can you point to me where it says

1 that?

2      A      Commitment verification, court

3 documentation, i.e., Bill of Information, Sentencing

4 Minutes or Uniform Commitment Order.

5      Q      Okay.  And does it say anywhere that the

6 Bill of Information should match the Sentencing

7 Order?

8      A      Not to my knowledge.

9      Q      If there are discrepancies between

10 documents, are there rules about which document

11 should control?

12      A      The Uniform Commitment takes over -

13 overrides the Sentencing Minutes and the transcript

14 - court transcript overrides everything.

15      Q      Okay.  And we'll look at --

16      A      I don't know that that's written, but

17 that's --

18      Q      Yeah.  And we're looking at regulation

19 B-04-01, Section 13-A.  It says, in all cases of

20 conflicting specified words from the courts, the

21 order of the last sentencing court shall control the

22 computation --

23      A      Correct.

24      Q      -- of the release dates.

25      A      Correct.

1    Q    So the court Sentencing Order is what

2    controls when there's a discrepancy; is that right?

3    A    The - now, the Uniform - like I said, the

4    Uniform Commitment Order overrides the Sentencing

5    Minutes now, because we haven't always gotten

6    Uniform Commitment Orders, but now we're supposed to

7    get them on all cases.

8    Q    So an order from the court is the thing

9    that's controlling, correct?

10    A    Correct.

11    Q    Okay.  Why is the Bill of Information

12    relevant to calculating a release date?

13    A    Because that's where we get the offense

14    date to know when to apply the credit.  If we - we

15    have to know, normally, what he was charged with.

16    Some Sentencing Minutes just say - when they

17    sentence - the minutes say count one, count two or

18    if he's got multiple counts, sometimes, that we have

19    to refer back to the Bill of Information.  In the

20    case of sex offenders is extremely important,

21    because if victim information is on there and it's a

22    minor victim, that's handled in a different - if the

23    date of birth and the age of the victim is on there,

24    it's a minor victim under twelve, it puts everything

25    in a different light, so it's extremely important, I

1    would say.

2        Q    But there's literally nothing - no rule

3    that says that the order of the counts on the Bill

4    of Information has to match the order of the

5    counts --

6        A    No.

7        Q    -- in the - let me start over.  There's

8    literally nothing - yeah, sorry.

9        A    Sorry.

10       Q    There's literally nothing, no rule, no

11   policy that says the order of the counts in the Bill

12   of Information has to match the order of the counts

13   in the judge's Sentencing Order, correct?

14       A    Correct.

15       Q    Okay.  So if those two things don't match,

16   it's no indication that there's been a violation of

17   a rule or a policy or anything like that?

18       A    No.

19       Q    Okay.  So now let's talk about Mr. De'Juan

20   Thomas.  Do you recall Mr. Thomas?

21       A    I recall him.

22       Q    My understanding is, he was sentenced on

23   January 25th, 2013.  Is that right?

24       A    I don't have it in front me.

25       Q    Sure.  I'll mark as Exhibit I.  This is a

1   document that says at the top, Sentence of the

2   Court.  Is this Mr. Thomas's Sentencing Order?

3        A    This is.

4        Q    And it says he was sentenced on January

5   25, 2013; is that right?

6        A    Correct.

7        Q    Okay.  And then Mr. Thomas came up to

8   David Wade Correctional Center to serve his term; is

9   that right?

10       A    Correct.

11       Q    Okay.  This exhibit is going to be Exhibit

12  J, which entitled at the top, Offender Admission

13  Summary, correct?

14       A    Correct.

15       Q    This is a document that was filled out for

16  him when he first arrived here; is that right?

17       A    No.

18       Q    Okay.  When would this have been done?

19       A    When he was at Hunt Correctional Center.

20       Q    I see.  So he went through an intake at

21  Hunt before coming to David Wade?

22       A    Correct.

23       Q    And this was done - well.  On the second

24  page of it, it's got his crime and sentences.  Do

25  you see that?

1        A    Yes, I do.

2        Q    And it looks like here it's got two years

3    for sexual battery; is that right?

4        A    Correct.

5        Q    Did you calculate Mr. Thomas's - let me

6    rephrase that.  Do you know who initially calculated

7    Mr. Thomas's release date?

8        A    It was done either at headquarters or

9    Hunt.  I can't remember when the - It was an S.

10   Brown, I believe, on there, but I didn't.  It was

11   not done here.

12       Q    It wasn't you?

13       A    No.

14       Q    You calculated his release date on four

15   occasions; is that right?

16       A    Several occasions.

17       Q    Yeah.  In your interrogatory responses,

18   you said you calculated his release date on four

19   occasions.  Does that sound right?

20       A    Probably so.

21       Q    Yeah.  The first time was to account for a

22   Jail Credit Letter; is that right?

23       A    Correct.

24       Q    The second time was to account for good

25   time credit he had earned; is that right?

1      A      Correct.

2      Q      The third time was also for good time

3  credit; is that right?

4      A      Correct.

5      Q      And then the fourth time, you changed his

6  release date from June 15th, 2015 to February 28th,

7  2017; is that right?

8      A      Correct.

9      Q      Okay.  So that's the time recalculation

10  that I understand to be the crux of this case?

11      A      Correct.

12      Q      So when I talk today about when you

13  calculated Mr. Thomas's time, that's the one I'm

14  going to refer to.  Will you understand that?

15      A      Yes.

16      Q      Okay.  That fourth recalculation was on

17  May 11, 2015; is that right?

18      A      That sounds right.

19      Q      And prior to you recalculating his time,

20  he was calculated and scheduled to be released on

21  June 5th, 2015; is that right?

22      A      Correct.

23      Q      And you recalculated his time and you

24  changed his scheduled release date from June 5th,

25  2015 to a full-term release date of February 28,

1    2017, correct?

2        A    Correct.

3        Q    And when you did that recalculation on

4    May, 2015, you had a copy of this Exhibit I, the

5    Sentencing Order from the judge, correct?

6        A    Yes, I did.

7        Q    And you reviewed it when you were doing

8    that recalculation in May of 2015; is that right?

9        A    Prior to May - Yeah, May, yes, I did.

10       Q    In the course of recalculating it, you

11   looked at the Sentencing Order?

12       A    I'm not sure I looked at it at that time

13   when I recalculated.  I had looked at it - I had

14   reviewed it, yes.

15       Q    So this may refresh your memory.  Your

16   answer to interrogatory number thirteen was, Ms.

17   Gryder does not recall the first time she saw the

18   Sentencing Order, but she did review when she

19   checked his record for release in May, 2015.

20       A    Yes.  That's not when I recalculated,

21   though.  I did review it prior to - I reviewed it

22   prior to recalculating his date.

23       Q    Okay.  So you did - there was a two-step

24   thing, you reviewed it and then you recalculated it?

25       A    No.  I did not.

1    Q    Maybe I'm misunderstanding.  Walk me

2   through what happened with --

3    A    Okay.  I reviewed this, along with the

4   Bill of Information.  I realized on the Bill of

5   Information the sexual battery was listed as count

6   three.  The kidnapping was count one.  Count two was

7   the malfeasance and sexual battery was the count

8   three and after looking at the sentencing and the

9   way they listed the counts and they - then went on -

10  counts one and three, five years.  Count two, two

11  years.  Well, in my mind, the count three on the

12  bill was sexual battery, so that's when I discussed

13  with Brenda that we need to get clarification, I

14  believe, to make sure, because sexual battery - he

15  had to serve all of it.  Okay?  So that would have

16  had a bearing on his time, so that's when I

17  contacted Orleans Parish for clarification.  I did

18  not change anything at that time.  Okay.  I

19  contacted the District Attorney's office and was

20  given, I believe - I was given the email address of

21  the Assistant DA.  I emailed him and told him that I

22  basically was - what I was questioning as far as the

23  time.  I wanted to make sure that he did get the two

24  years on the sexual battery and not five.  At some

25  point, I spoke with the Assistant DA on the phone

1    and he told me that he got five years on the sexual

2    battery.  I did not - still did not recalculate Mr.

3    Thomas's time at that date, but I knew it was going

4    to be that the minutes were going to be amended,

5    okay, so I followed up on Docket Master and it was,

6    of course - I don't remember how many days, but I

7    did pull up the docket master, the minutes.  They

8    had entered an amended minute entry on Docket Master

9    giving him five years on the sexual battery.  I,

10   again, emailed the District Attorney at Orleans to

11   verify that those minutes were correct before I

12   recalculated his time, and he said, yes, it is

13   correct, so at that time, that's when I recalculated

14   Mr. Thomas's time.

15        Q    I see.  And this was all triggered because

16   Mr. Thomas was scheduled to be released in June of

17   2015 and so you were double checking his release

18   date prior to his release?

19        A    Yes.

20        Q    So we'll go through that step by step.  So

21   he's scheduled to be released, so you're reviewing

22   his documents?

23        A    Correct.

24        Q    And you see his Sentence Order?

25        A    Correct.

1    Q    Is there anything ambiguous about this

2  Sentence Order?

3    A    Explain.

4    Q    Is there anything that makes it unclear

5  what the judge is ordering here?

6    A    After reading the Bill of Information, t's

7  - I mean, this is clear, but it's in contrast to the

8  Bill of Information.  That's what triggered the

9  question for me that I sought clarification.

10    Q    So this Exhibit I, the judge's Sentencing

11  Order, is clear?

12    A    It is.

13    Q    Okay.  It's only if you compare the order

14  of counts in the Sentencing Order to the Bill of

15  Information that there's any discrepancy?

16    A    Correct.

17    Q    But there's nothing that says those two

18  things have to match, right?

19    A    I don't have anything - I don't have

20  anything that says it has to match, no.

21    Q    Do you have any reason to believe they

22  should match?

23    A    I do, because, in most cases, I believe

24  the Bill - the counts on the Sentencing Minutes

25  follow the Bill.

1    Q    But no law says they have to match?  No
2  policy says they have to match?

3    A    Not to my knowledge.

4    Q    But you thought maybe the Sentencing Order
5  was wrong?

6    A    I didn't know if it was wrong.  That's why
7  I asked for clarification.  I wanted to make sure
8  that it was correct, that it was - I wanted to make
9  sure that his time was correct as the judge ordered.
10  Okay?

11    Q    But this is the judge's order.

12    A    It may be, but, in my mind, I don't know
13  if the judge actually - is this his original
14  signature?  I don't know.  Minute clerks - judges
15  don't write the order.  They may sign them, but
16  don't always get a signed order from the judge,
17  okay, they're not all signed.  They're certified,
18  usually, but I wanted to make sure I was - that Mr.
19  Thomas did have the sentence that the judge ordered,
20  that's why I asked for clarification to make sure,
21  because, like I said, it wouldn't have made a
22  difference if they all three had been like - one of
23  them - kidnapping was a crime of violence.  Sexual
24  battery is a crime of violence, but it's also a sex
25  offense that's denied good time, so - but if all the

1  - all three counts had been, say, under one act or

2  that he would have served the same amount, it

3  wouldn't have made a difference, really, but, in

4  this case, it could have made a bid difference.

5      Q    Right.  It mattered which count got - it

6  mattered whether the sexual battery got two or five

7  years, --

8      A    Correct.

9      Q    -- because sexual battery is not eligible

10  for good time?

11      A    Correct.

12      Q    So if sexual battery was two years, he

13  should be getting out on June 5th, 2015?

14      A    Correct.

15      Q    And if sexual battery was five years, he

16  shouldn't be getting out until February of 2017?

17      A    Correct.

18      Q    So this order is signed by the judge.  Do

19  you see that?

20      A    Right, I do.

21      Q    Do you have any reason to believe that's

22  not his signature?

23      A    No, no.

24      Q    Any reason to believe this is - well, let

25  me start over.  I'm confused.  You've got an order

1    signed by the judge, but you're thinking maybe this

2    isn't actually the judge's order?

3         A    I'm thinking it could possibly be an error

4    in there.  Like I said, the judge does not type

5    these up.  Minute clerks type these up.

6         Q    But he signed it, right?

7         A    He signed it.  I assume he - I have to

8    assume that he signed that.  It's not stamped.

9    Okay?

10        Q    Did you look up to see whether this

11   situation was covered by any Department of

12   Correction policies?

13        A    No.

14        Q    Did you look up to see whether this was

15   covered by any David Wade policies?

16        A    No.

17        Q    Laws?

18        A    Why?

19        Q    Did you look up to see whether this

20   situation was covered by any laws?

21        A    Oh, by laws?  No.

22        Q    Did you look up to see whether this

23   situation was covered by any cases?

24        A    No.

25        Q    So the only thing to suggest to you that

1  there was any discrepancy here was your belief that

2  the judge's Sentencing Order should match the Bill

3  of Information; is that right?

4      A    That was my concern, to make sure that the

5  counts were listed correctly.

6      Q    But you had no basis for that concern

7  except your own belief that those two should match,

8  right?

9      A    Correct.

10     Q    Okay.  And you said you brought this to

11 Brenda Acklin's attention?

12     A    Correct.

13     Q    Did you do that in person or by telephone?

14     A    No, in my office.

15     Q    How did that conversation go?

16     A    I don't recall.

17     Q    Did she - do you recall if she agreed with

18 you that there was a problem here?

19     A    Let me answer this.  I didn't know that

20 there was a problem.  That's why I wanted

21 clarification.  She agreed with me that it would be

22 worth seeking clarification on.

23     Q    Even though this order is clear?

24     A    Correct.

25     Q    You thought that you needed clarification

1    for an order that is clear?

2        A    I needed clarification to make sure that

3    he got - Mr. Thomas did, in fact, get two years on

4    the sexual battery and not five.

5        Q    Right.  But we've established this order

6    is clear --

7        A    Correct.

8        Q    And you needed clarification?

9        A    Correct.

10       Q    So you needed clarification for a clear

11   order?

12       A    Correct.

13       Q    And you and Ms. Acklin decided that you

14   should contact the court for clarification?

15       A    I decided to - she agreed that we would

16   seek clarification and I contacted the District

17   Attorney's Office.

18       Q    But the plan was to contact the court for

19   clarification; is that correct?

20       A    You're talking about the judge's office?

21       Q    Let me read you your interrogatory number

22   twelve and maybe that will refresh your - so in your

23   response to answer - let me start over.  In your

24   response to interrogatory number twelve, you wrote,

25   after discussing the issue with Ms. Acklin, they

1  decided to contact the court for clarification.  Is

2  that right?

3        A     That would be correct, and by - through

4  the District Attorney's Office.  I did not - would

5  not probably have called the judge's office into the

6  last - you know, would clarify it through the court

7  or through the DA's Office.

8        Q     Okay.  So you wanted clarification from

9  the court?

10       A     Yes.

11       Q     But you didn't contact the court?

12       A     No.

13       Q     You didn't contact the Clerk of Court?

14       A     I cannot say.  I don't recall.  Orleans is

15  difficult.  We, at times, tried to contact them and

16  it's very difficult.

17       Q     This may refresh --

18       A     Okay.

19       Q     Request For Admission number eleven, at no

20  point did Ms. Gryder contact the Orleans Clerk of

21  Court regarding Plaintiff's sentence.

22       A     And I don't recall.

23       Q     Okay.

24       A     I don't recall whether or not I did.

25       Q     Did you contact Judge Marullof?

1     A    No.

2     Q    Did you contact Judge Marullof's staff?

3     A    No.

4     Q    Did you contact the Public Defender's

5  Office?

6     A    No.

7     Q    But you contacted the DA's Office?

8     A    Yes, I did.

9     Q    Why didn't you contact the Public

10  Defender's Office?

11    A    I don't know.  I contacted the District

12  Attorney's Office because they do the - handle the

13  Plea Agreements and I figured they would have a

14  record of it and know where to go from there, so...

15    Q    The Public Defender's Office also handles

16  Plea Agreements, right?

17    A    I don't know.  I assume they do.

18    Q    Did you think that the Public Defender's

19  Office might be biased, since they were on one side

20  of things --

21    A    No.  No, I did not.

22    Q    Okay.  So then Docket Master got changed?

23    A    Yes.

24    Q    Docket Master is the minutes of the court?

25    A    That's where they post the minutes of the

1    court, yes.

2        Q    And then you contacted the District

3    Attorney again?

4        A    Correct.

5        Q    The second go-round, you didn't contact

6    the court?

7        A    No.

8        Q    Not the judge?

9        A    No.

10       Q    Not the Public Defender?

11       A    No.

12       Q    And then you recalculated Mr. Thomas's

13   sentence?

14       A    Correct.

15       Q    Based on the minutes of the court?

16       A    Correct.

17       Q    Do the minutes of the court control over a

18   judge's Sentencing Order?

19       A    I consider the judge's order is the

20   minutes of the court.  That is the minutes of the

21   court.

22       Q    The minutes of the court is the judge's

23   sentence?

24       A    It's supposed to be.

25       Q    So if you've got a conflict between the

1  minutes and a judge's signed order, which is

2  controlling?

3       A    That is the - to me, is the minutes.

4  That's what we consider the minutes of the court, is

5  the Sentencing Minutes, whether it's signed by the

6  judge or not, that's what we consider the Sentencing

7  Minutes.

8       Q    Okay.  Docket Master shows the minutes of

9  the court, right?

10      A    Correct.

11      Q    It's got a bunch of different dates.  It

12  says what's on each date, right?

13      A    Correct, what occurred in court.

14      Q    And then a separate thing is a judge's

15  signed Sentencing Order, right?

16      A    Correct.

17      Q    If there's a discrepancy between those two

18  things, which controls?

19      A    I don't know that it would be a

20  discrepancy between this and the Sentencing Minutes

21  - I mean, the Docket Master.  Is that what you're

22  saying?  It should be the same, they should be the

23  same.  The Docket Master should reflect what's on

24  the minutes and I've always found that to be the

25  case.

1      Q     Okay.  So before we get to Mr. Thomas,

2   let's just talk generally.

3      A     Okay.

4      Q     If there were a discrepancy between Docket

5   Master and a judge's signed order, which controls?

6      A     Well, it would be the order, but I've --

7      Q     The signed order?

8      A     -- never found a discrepancy between the

9   Docket Master - what was on the Docket Master, to my

10  knowledge, and the minutes, okay, or the signed

11  order.  Like I said, we don't get - most of our

12  minutes are not signed by the judge.

13     Q     So after you talked to the DA, the Docket

14  Master Minutes were updated, right?

15     A     They were amended.

16     Q     Amended.  And they said five years for

17  sexual battery?

18     A     Correct.

19     Q     Okay.  And this Exhibit I, which is the

20  signed Sentencing Order by the judge, says two years

21  for sexual battery, right?

22     A     Right.

23     Q     Is that a discrepancy between those two

24  documents?

25     A     Yes, it is.

1    Q    Right.  And you just said a moment ago

2  that the judge's signed Sentencing Order controls

3  over the minutes, correct?

4    A    I did.

5    Q    Okay.  And then you changed Mr. Thomas's

6  sentence to five years for sexual battery; is that

7  right?

8    A    Correct.

9    Q    Did you make an attempt to get the

10  sentencing transcript of the court?

11    A    No, we don't order - DOC does not order

12  transcripts.

13    Q    So that all happened in May of 2015; is

14  that right?

15    A    Correct.

16    Q    And then did you meet with De'Juan Thomas

17  that --

18    A    I did.

19    Q    -- later that summer?

20    A    I did.  Later that day, once I

21  recalculated his time.  I believe it was the same

22  day.

23    Q    Okay.  And what happened in that meeting?

24    A    I talked to him and explained to him what

25  - that I had gotten clarification that he had gotten

1    five years for the sexual battery and that I had to

2    change his time and gave him a copy, I'm sure, of

3    the new Master Prison Record.

4        Q    And when you said that he got five years

5    for sexual battery, you were basing that on the

6    Docket Master minutes?

7        A    On the amended court minutes, yes.

8        Q    What was his response?

9        A    I don't recall.

10       Q    Did you suggest that if he got the

11   sentencing transcript and it showed something

12   different that his sentence would be changed?

13       A    I probably did.  I'm sure I did tell him

14   that.

15       Q    Because the sentencing transcript is

16   important to resolving any discrepancies?

17       A    Correct.

18       Q    But you didn't take any steps to obtain

19   the transcript?

20       A    No.  I'm not authorized to order

21   transcripts.

22       Q    What indicates that you're not authorized

23   to order transcripts?

24       A    They cost money and we don't - DOC does

25   not order transcripts.  To my knowledge, we've never

1    ordered court transcripts.

2         Q    Because they cost money?

3         A    Well, we have to - that's something we

4    would have to pay for.  I'd have to get special

5    authorization for that.  No, I've never ordered a

6    court transcript.

7         Q    Did you seek special authorization in Mr.

8    Thomas's case to get a court transcript?

9         A    No, I did not.

10        Q    Okay.  We're going to label this Exhibit

11   J.  Do you recognize this?  It says at the top, from

12   the desk of Sally Gryder, WCC, Records Office, June

13   26, 2015.  Do you see that?

14        A    Yes.

15        Q    Do you recognize this document?

16        A    Yes.

17        Q    What is that?

18        A    That's the letter I sent to him in

19   response to a letter he sent to me.

20        Q    Okay.  Do you recall what he said in his

21   letter?

22        A    Basically, he wanted to talk to me about

23   his refusal of good time, is what he said.

24        Q    What does that mean?

25        A    I wasn't sure what he - I don't know.  I

1    thought maybe he was trying to refuse his good time,

2    but, you know, I don't know, I misunderstood - I

3    think I might have misunderstood his - what he was

4    questioning me - or asking me to see me about, but

5    that was my response to him at the time.

6        Q    I get the sense that he thought that he

7    should be released on June 5th as originally

8    scheduled; is that right?

9        A    That's what he thought.

10       Q    And now, looking back on it, with

11   everything you know today, he was correct, he should

12   have been released on June 5th, 2015; is that right?

13       A    Yes.

14       Q    Okay.

15       A    Let me clarify that.  Based on the fact

16   that they, again, corrected his minutes.  Okay.

17   Once they entered that amended minutes, that

18   overrode everything as far as his time.  I mean, we

19   had to - I didn't have a choice at that time but to

20   recalculate his time.

21       Q    What says the minutes override everything

22   else?

23       A    The last order of the court, that was the

24   last order of the court.

25       Q    Okay.  So now we're going to look at a

1    document I'm going to label Exhibit K.  Do you

2    recognize this document?  It says at the top, from

3    the desk of Sally Gryder --

4         A     This is from me, sure.

5         Q     It's dated August 7th, 2015, from the desk

6    of Sally Gryder; is that right?

7         A     Correct.

8         Q     And this is from you to De'Juan Thomas?

9         A     Correct.

10         Q     And you write, if you believe your

11    sentence to be incorrect, then you or your attorney

12    need to contact the sentencing court; is that right?

13         A     Correct.

14         Q     Until this office receives additional

15    information from Orleans Parish contrary to what we

16    have, your sentence will remain the same?

17         A     Correct.

18         Q     So if you got information - new

19    information, you would change your his sentence; is

20    that right?

21         A     If we had information, yes, if I had the

22    correct documentation.

23         Q     This is a document we're going to label

24    Exhibit L.  This appears, to me, to be a letter to

25    Ms. S. Gryder from De'Juan Thomas.  Do you see that

1    at the top?

2         A    Yes.

3         Q    Do you recall receiving this letter?

4         A    I don't recall receiving it.  I recognize

5    the letter as having been sent to me from him.

6         Q    Okay.  So this is familiar to you?

7         A    Yes.

8         Q    At the bottom it said - towards the bottom

9    it says, I repeat what was said to me by you on July

10   27th, 2015, if you get me a copy of the sentencing

11   transcript, I would make the change, end quote --

12        A    Correct.

13        Q    Is that something that you told him?

14        A    I normally tell offenders, when I - that

15   if they can get a copy of the transcript and it

16   verifies what they're telling me or believe to be

17   correct, then we will change their time based on a

18   transcript, so I feel I probably did - I'm sure I

19   told him that.

20        Q    So the hierarchy of documents, in your

21   understanding - let me see if I've got this right.

22   Is at that top, you've got the sentencing

23   transcript?

24        A    Correct.

25        Q    And that controls over a signed order by

1    the judge?

2         A    That controls everything.

3         Q    The sentencing transcript controls

4    everything?

5         A    Yes.

6         Q    So on the top, you got the sentencing

7    transcript controls over a signed order of the

8    judge?

9         A    Uh-huh. (yes)

10        Q    And the signed order of the judge controls

11   over minutes of the court?

12        A    I'll repeat what I said.  The minutes of

13   the court and the signed order, to us, are the - I

14   mean, the same.

15        Q    Okay.  But earlier you said if there's a

16   discrepancy between those two, the signed order of

17   the court controls.

18        A    Between that and what?

19        Q    The minutes of the court.

20        A    That is the same, to me.

21        Q    We can read it back, if you'd like.

22        A    That's fine, but, to me, the minutes of

23   the court that I've got here signed by the judge -

24   it is signed by the judge and it's an order of the

25   court, but it's also the minutes, what we use to

1  calculate the time, the minutes of the court.  It

2  should be one and the same.

3      Q    Right.

4      A    You understand what I'm trying to --

5      Q    Yeah.

6      A    They should be the same.

7      Q    And earlier we talked - if there's a

8  discrepancy - they should be the same, but if

9  there's a discrepancy, the signed order of the court

10 controls over the minutes.  That's what you

11 testified earlier, to my recollection.  Is that

12 correct?

13     A    I don't know how to answer that because

14 they are - to me, they're the same, the minutes and

15 the Sentencing Order.  Like I said, this - the

16 Sentencing Order signed by this judge is one form

17 that we get, but, to me, it's the same and it should

18 - there should be no discrepancy between the minutes

19 and the Sentencing Order, is what I'm getting at.

20     Q    So the transcript is on top, everything

21 else, below it?

22     A    Correct.

23     Q    Next is Exhibit M.  This appears, to me,

24 to be an order signed by Judge Bosworth.  Is that

25 what it looks like to you?

1      A     Correct.

2      Q     It says, Motion for Correction of Illegal

3   Sentence; is that right?

4      A     Correct.

5      Q     At the bottom, it says, the defendants -

6   and this is State of Louisiana versus De'Juan

7   Thomas.

8      A     Correct.

9      Q     The defendant's assertions are correct

10  with regard to his sentence.  It says that at the

11  bottom?

12     A     Correct.

13     Q     Okay.  Have you ever seen this document

14  before?

15     A     To my knowledge, the first time I saw it

16  was when my attorney sent it to me through an email.

17     Q     Okay.  After this case was filed?

18     A     Yes.

19     Q     Mr. Thomas says he sent it to you.  You

20  don't have any recollection of that?

21     A     I have no - it was not in his file, to my

22  knowledge.

23     Q     Okay.

24     A     Can I ask a question?

25     Q     Yeah, please.

1      A     Are you talking about this letter - what

2   he said in this letter he sent to me in August?

3      Q     No, I'm not asking about that right now.

4      A     Okay, okay.

5      Q     We were just talking about Judge

6   Bosworth's --

7      A     Okay.

8      Q     -- order there.  Next is a document,

9   Exhibit N, as in Nancy.

10     A     Okay.

11     Q     It's dated at the top, November 18th,

12  2016.  It's from De'Juan Thomas to Ms. Gryder.

13     A     Uh-huh. (yes)

14     Q     Do you recall receiving this?

15     A     I don't recall.

16     Q     Okay.  It says, I received court documents

17  supporting my claim of having two years to serve on

18  the sexual battery charge.  You see that here?

19     A     Correct.

20     Q     Any reason to believe you didn't receive

21  this document?

22     A     No, I'm not disputing that.

23     Q     Did you meet with him after receiving this

24  document?

25     A     Not to my knowledge, no, I did not.  I

1   wrote this, put on call-out, intending to - that's

2   my handwriting.

3      Q   Okay.  So you said, put on call-out.  Why

4   put on call-out?

5      A   To go down and talk to him.  He had

6   requested to see me.

7      Q   Okay.

8      A   And I put it on call-out, but I don't

9   recall talking to him at this point, okay, after

10   this.

11      Q   Do you think you didn't meet with him or

12   you just don't recall whether you did or not?

13      A   I don't believe I did, because he never

14   showed me any more documents at this point.  I did

15   not see any more documents from him until he sent

16   his documents up to the Records Office to Ms.

17   Acklin.

18      Q   What documents were those?

19      A   It was the sentencing transcript, was all

20   that we got.

21      Q   I'm labeling a document Exhibit O.  Is

22   this the sentencing transcript you were just talking

23   about?

24      A   Correct.

25      Q   And on the last page of the document it

1    says, two years for sexual battery, correct?

2        A    Correct.

3        Q    So this matches the signed order of the

4    court that he got two years for sexual battery?

5        A    Correct.

6        Q    So Mr. Thomas got two years for sexual

7    battery?

8        A    Correct.

9        Q    Okay.  So do you recall when you first saw

10   this transcript?

11       A    After Brenda Acklin received it from Mr.

12   Thomas.

13       Q    In your interrogatory responses, you said

14   that was about December 5th to 8th or so?

15       A    But that's the date I believe her letter -

16   his letter to her was dated.  He sent a letter up to

17   her with the transcript and that was the date of the

18   letter, and I'm not sure exactly what date she got

19   it, but that's the date he wrote the letter, I

20   believe.

21       Q    So you think it was about December 5th to

22   8th or so --

23       A    Yes.

24       Q    -- that you saw this transcript for the

25   first time?

1      A      Correct.

2      Q      So what happened next?

3      A      Ms. Acklin handled it from there.  I

4  didn't have anything else to do with the case until

5  I - but I did process him for release, so - and I

6  did notify - well, when we got the transcript and I

7  realized that he did get the two years, I

8  immediately contacted the District Attorney's Office

9  Orleans Parish again through email and told them

10  that he did, in fact, get the two years, they needed

11  to go back and correct his minutes again.

12      Q      Why did Ms. Acklin take over from there?

13      A      Well, because he sent the letter and the

14  transcript up to her.  Had I gotten it, I would have

15  been the one to handle it, but he sent it to her.

16      Q      So when you got the sentencing transcript,

17  you realized he should have been released - well,

18  let me start that question over.  When you received

19  the sentencing transcript and looked at it in early

20  December, 2016, you realized he should have been

21  released in June, 2015, right?

22      A      Correct.

23      Q      How did you feel about that?

24      A      Well, I hated that a mistake had been

25  made.  I did not make the mistake, though.  I only

1  sought clarification, so I did not make the mistake.

2      Q    You didn't make any mistakes?

3      A    No, I didn't make a mistake.  I sought

4  clarification and all they had to do was tell me -

5  clarify that he in fact got two years and his - had

6  they told me at the time - and not changed his

7  minutes, I would never have recalculated his time.

8  I think that's evident.  I recalculated his time

9  based on amended minutes from Orleans Parish.  I

10  didn't have anything to do with what Orleans did.

11      Q    Do you think it was a mistake to seek

12  clarification?

13      A    No, I don't.  I don't think it's ever a

14  mistake to seek clarification.

15      Q    Even if a document is clear?

16      A    Even if the document is clear, but I

17  wouldn't have sought clarification, had I not

18  thought there was a reason to.

19      Q    So you made no mistakes with Mr. Thomas

20  whatsoever?

21      A    No, I didn't.

22      Q    Okay.  But due to your actions, Mr. Thomas

23  spent more than a year and a half in prison longer

24  than he should have, correct?

25                      MR. EVANS:  Object to form.  You

1          can answer --

2     A     That's incorrect.  Can I answer that?

3               MR. EVANS:  Yeah, you can answer

4               it.

5     A     That is certainly incorrect.  That's an

6     incorrect statement.

7     Q     Why is it an incorrect statement?

8     A     Because I didn't correct the minutes.

9     Orleans Parish corrected the minutes.  Sally Gryder

10    did not correct any minutes.  That was done at

11    Orleans.

12    Q     But if you hadn't reached out to the DA's

13    Office, Mr. Thomas would have left prison on his

14    correct release date, on June of 2015, correct?

15    A     Yes, yes.

16    Q     And so your actions resulted in him being

17    held a year and a half --

18    A     No.

19    Q     -- past that?

20    A     I'm sorry.  I have to disagree with you.

21    My actions did not.  I asked for clarification,

22    that's all.  All they would have had to told me was

23    he got two years for the sexual battery.  That's all

24    I was trying to make sure of, so I don't accept

25    responsibility for that, no.  I will accept

1    responsibility for my mistakes when I make one.

2    That was not a mistake.  I didn't make the mistake,

3    because I didn't correct the minutes.  I didn't

4    suggest to them, even, that he got five years for

5    sexual battery.  I just asked for clarification.

6        Q    There's nothing that suggests that counts

7    - that a Bill of Information has to match a

8    sentence, correct?

9        A    It doesn't, but in that case of a sex

10   offense, I wanted to make double sure.  I do not

11   want to release an offender in error.  I wanted to

12   make sure - we try very hard to make sure that we

13   calculate the sentence that the judge, in fact,

14   ordered and the way that the judge wanted it

15   ordered, so...

16       Q    So you applied a special level of scrutiny

17   to Mr. Thomas's case because he was a sex offender?

18       A    Yes, as far as the Bill of Information,

19   because I always would check that for victim

20   information and, like I said, a sex offense, too,

21   and in his case, he had one crime of violence, one

22   non-crime of violence and then he had the sex

23   offense, so I did, I scrutinized it a little bit

24   closer than I would have otherwise.

25       Q    So because he was a sex offender, you

1    checked to see if the counts between the Bill of

2    Information and the sentencing were a match when you

3    wouldn't have for another kind of crime; is that

4    right?

5        A    No, it is not.  That's incorrect.

6        Q    So what was the special scrutiny that you

7    applied because he was a sex offender?

8        A    I checked his Bill of Information for,

9    like I said, victim information to make sure - one,

10   probably, victim information, the initial onset, and

11   then I realized that the count three was sexual

12   battery with how the counts were listed, and so

13   that's why I questioned it, to make sure.

14       Q    I'm confused.  There's nothing that says

15   the Bill of Information has to match the Sentencing

16   Order, right?

17       A    Right.

18       Q    So why do you need to clarify if they

19   don't?

20       A    Let me ask you a question.  Can I ask you

21   a question.

22       Q    Go ahead.

23       A    Is it not my right to ask for

24   clarification?

25       Q    I don't know what your rights are.

1    A    Well, I feel, since I'm responsible for

2    releasing an offender, that if I do have a question,

3    that it is within my right to seek clarification.  I

4    believe it's within my right, or anyone that does

5    time computation, if there's a question, we have a

6    right to seek clarification.

7    Q    Okay.  The next document is going to be

8    Exhibit P.  This is a document - at the top, it

9    says, Time Computation and Jail Credits, name,

10   Thomas, comma, De'Juan.  Do you see this?

11   A    Uh-huh. (yes)

12   Q    Is this from CAJUN?

13   A    Yes.

14   Q    Is this a time computation worksheet?

15   A    Yes.

16   Q    Okay.  So this is what you were referring

17   to earlier when you --

18   A    Correct.

19   Q    So in your interrogatory responses when

20   you talk about time computation worksheets, this is

21   what you're talking about?

22   A    Yes, when we're talking about his actual

23   time, yes.

24   Q    Okay.  So I'm going to ask you to help me

25   understand this document.

1      A     Okay.

2      Q     I'll tell you how I understand it and you

3  can tell me if I'm right or wrong.

4      A     Okay.

5      Q     My understanding is, there's three columns

6  here, one, two and three, and each of these

7  represents a different crime; is that right?

8      A     Correct.

9      Q     And then going down the sheet indicates

10  sort of what happens with that crime, when they're

11  arrested, when their sentence starts, etc. --

12      A     Correct.

13      Q     Sentence length, it says, year/year,

14  month/month, date/date, so if it says 005/00/00,

15  that's a five-year sentence?

16      A     Correct.

17      Q     Okay.  And under that it says, jail

18  credit, 329, so that's the number of days the person

19  spent in pretrial detention?

20      A     Correct.

21      Q     So that's what they should get for jail

22  credit?

23      A     Uh-huh. (yes)

24      Q     My understanding is you calculate years

25  365.25 --

1     A    Correct.

2     Q    -- days a year?

3     A    Correct.

4     Q    So then under that it says, bal. owed, and

5 there's a number.  My understanding is that's - if

6 you take away their jail credit from their sentence,

7 that's what's left over?

8     A    Correct.

9     Q    And then under that it says, GT Act.

10 That's Good Time Act?

11     A    Correct.

12     Q    And the 0110, that means it's Act 110,

13 that's the kind of good time they're getting?

14     A    Correct.

15     Q    And then below that it says, must serve,

16 so that's the date - and it's got 401.  That's the

17 number of days; is that right?

18     A    That's the number of days as the must

19 serve.

20     Q    And 02-28-2014, that's when they should be

21 released based on good time and jail credit --

22     A    On that - on that offense, yes.

23     Q    So if they got three crimes, they should

24 be release on the latest of these three dates --

25     A    Now - yes.  Now, let me explain something.

1     Q    Please.

2     A    If you look at the bottom, okay, that is

3 the initial good-time date, then at the bottom

4 underneath the dotted line, you'll see at the top

5 line, total, t-o-t, and under that, loss?

6     Q    Uh-huh. (Yes)

7     A    Okay.  That's if they forfeit good time.

8 It's not going to show up here on this date.  The

9 forfeiture would show up there or if they earned

10 CTRP credit, then that goes down on another line and

11 that - the date - the corrected date ends up under

12 the dotted line right here.

13     Q    And CTRP, that's classes they can take to

14 get time off their sentence?

15     A    Correct.

16     Q    Yeah.  What does DS stand for?

17     A    Diminution of sentence.

18     Q    Diminution of sentence.

19     A    Uh-huh. (yes)

20     Q    Okay.  So under the dotted line where it

21 says, raw DS, and a date, that's the date they

22 should be released based on good time?

23     A    That's the date - that is the original DS

24 date.  Okay?

25     Q    So that's the date they should be released

1    based on jail credit --

2        A    Yes.

3        Q    -- and good time, --

4        A    Yes.

5        Q    -- CRTP, but not including days they've

6    lost for screwing up?

7        A    Yes.

8        Q    Okay.  And then ADJ, DS, that's adjusted

9    diminution of sentence date?

10        A    Correct.

11        Q    And that's the date taking into account

12    everything?

13        A    Correct.

14        Q    So if we're looking at a page like this

15    and we want to know when does this person get out,

16    we look to the adjusted DS date?

17        A    Correct.

18        Q    And it says, computed by B. Acklin,

19    12-21-2016.  That's the day she did this

20    computation?

21        A    Correct.

22        Q    And the adjust DS date is 12-21-2-16?

23        A    Correct.

24        Q    So she's doing the calculation.  Now, he -

25    at this point, he should have gotten out in 2015,

1  right?

2      A    Correct.

3      Q    There's adjusted DS date - they've just

4  said the day he should get out is today, because

5  we're doing the calculation today?

6      A    She did the date, yes.

7      Q    So they don't say, but he should have

8  gotten out before, they just --

9      A    No.

10     Q    -- update the release date to the day

11 they're doing the calculation, --

12     A    Correct.

13     Q    -- if that person is eligible for

14 immediate release?

15     A    Uh-huh. (yes)

16              MR. EVANS:  Let him finish his

17              question.  Just --

18              THE WITNESS:  Okay.

19              MR. EVANS:  You're doing fine,

20              just - it's all right.

21     Q    So I'll just say that one more time.  So

22 when someone is found to be eligible for immediate

23 release, maybe they should have been released a long

24 time ago.  The calculation is done and they just do

25 the adjusted DS date as that day of the calculation?

1     A     Well, it automatically computes because he

2  was - he should have been released in the past.  The

3  day that she did the time recalculate, it's going to

4  come up to that date, the date of recalculation.

5     Q     Okay.  So as of 12-21-2016, De'Juan Thomas

6  was eligible for immediate release?

7     A     No.  I have to answer no.

8     Q     Why not?

9     A     Because he was a sex offender releasing

10 under supervision, he had to have an approved

11 Residence Plan and state ID.

12    Q     You and Brenda got the sentencing

13 transcript around December 5th to 8th, right, of

14 2016?

15    A     Whatever day, I'm not sure, but that - he

16 wrote he letter, I believe you said, on the 5th; am

17 I correct?  Then we would - she would have gotten it

18 sometime after that date.

19    Q     And then it took approximately two weeks

20 for her to do this calculation?

21    A     She - you'd have to talk to her about

22 that, but I believe she notified Classification that

23 he needed a Residence Plan and she didn't

24 immediately do it, because we knew he needed an

25 approved Residence Plan, so...

1    Q   So around the 5th to 8th, y'all knew that

2 he was eligible for immediate release once he got a

3 Residence Plan and it was taking some time do the

4 Residence Plan, so she waited until the 21st to do

5 this calculation, because you were still waiting for

6 the Residence Plan, does that sound right?

7    A   Yes.

8    Q   Okay.  I'm just trying to understand why

9 it took a couple of weeks to calculate the date.

10    A   Yeah.

11    Q   And then where it says FTD on this

12 document, that's full term date?

13    A   Correct.

14    Q   And that means if they were to serve the

15 full time of their sentence with no good time, no

16 CRTP?

17    A   Correct.

18    Q   But it does take into account jail credit?

19    A   Yes.

20    Q   Okay.  I'm learning to read these

21 documents.

22    A   Good.  Maybe you'll want to get hired on

23 as a --

24    Q   No, I'm not going to make job jump right

25 now.  So you said earlier that if an inmate is found

1 to be eligible for immediate release, they need to

2 get a Residence Plan approved in some situations?

3     A    Yes, if it's a sex offender.

4     Q    Including sex offenders, right.  So either

5 they have to already have a Residence Plan approved,

6 or, if they don't, they have to get one?

7     A    Correct.

8     Q    And if they've already gotten one

9 approved, then they're good to go and they're

10 eligible for immediate release, they can be released

11 in a day or two?

12     A    Basically, now, we - in the case of sex

13 offenders, we try to get a state ID for every

14 offender.  A sex offender has to have a marked ID,

15 so we normally, as a general rule, we don't release

16 them prior to their getting that state ID, but that

17 can take, you know, two or three days, sometimes

18 longer, but usually we can get one in two or three

19 days.

20     Q    But if they're found to be eligible for

21 immediate release and they've already gotten an

22 approve Residence Plan, they don't need to get a new

23 one, correct?

24     A    If it's all been approved - it depends on

25 how long ago it was approved.  If his was approved

1    in '15, if he had a Sex Offender Residence Plan

2    approved that date and he didn't release until the

3    end of '16, it has to be resubmitted.

4         Q    Okay.  So there's an expiration date on a

5    Residence Plan?

6         A    I believe so.

7         Q    Where does it say that?

8         A    I'm not sure.  You'd need to talk to

9    Classification on that.  They're the ones that file

10   the Residence Plans, but there is a time limit,

11   because things change and in the case of sex

12   offenders, the situation - they go out and review

13   the residence.  The situation could have changed, so

14   after a certain period of time, to my knowledge - to

15   my knowledge, they do require them to submit another

16   Residence Plan or to review the other one.

17        Q    So when you find someone is who eligible

18   for immediate release, you contact classifications

19   and say, this guy is eligible for immediate release?

20        A    We need a residence plan.

21        Q    But how do you know if he needs a

22   Residence Plan or not?

23        A    If he's under supervision, he's got to

24   have a Residence Plan.  If he's a sex offender

25   releasing under supervision, he has to have an

1  approved Residence Plan.

2     Q   And how do you know if he needs a new one

3  or if he's already got one and he's good to go?

4     A   Well, Classification is responsible for

5  submitting - giving us Residence Plans.  They know

6  when an offender is coming up for release, okay, if

7  he's not an immediate release or whatever, and then

8  they - normally, they do their plans so many - so

9  far ahead of time.  Sex offenders, I believe, but,

10  like I said, I'm not going to answer that.  You'd

11  need to talk to Classification about what the length

12  of time is.  It's within a certain period of time, I

13  think, they have file for the Sex Offender Residence

14  Plans.  They can't just apply - like apply today and

15  get it approved and then he's not releasing for a

16  year down the line.  It doesn't work that way.

17     Q   So if you've got someone who is eligible

18  for immediate release, you tell Classifications and

19  they determine whether he needs a new plan or he's

20  already got one?

21     A   That's up to them.

22     Q   Okay.  I've got a law in front of me.

23  It's RS 15:560.3.  Have you ever seen this law

24  before?

25     A   I have knowledge of it, because it's one

1    of the - I believe it's one of the forms that we

2    attach - statutes that we give to them - a sex

3    offender upon his release.

4        Q    Yeah.  And it says, upon his release from

5    incarceration, and then subsection twelve says,

6    submit a Residence Plan for approval.

7        A    Uh-huh. (yes)

8        Q    Is that right?

9        A    Correct.

10       Q    So it looks to me like this law says you

11   need a Residence Plan upon release - I'm sorry, let

12   me start over.  This law looks to me to say, upon

13   release, a sex offender needs to submit a residence

14   plan for approval right?

15                   MR. EVANS:  Object to form.  You

16                   can answer.

17       A    We cannot release a sex offender under

18   supervision without an approve - prior approved

19   Residence Plan.

20       Q    Based on what?

21       A    Based on departmental policy and the law,

22   I would think.

23       Q    This law seems to suggest it happens upon

24   the offender's release, right.

25                   MR. EVANS:  Object to form.  You

1            can answer.

2        A    Okay.  I'd have to read the whole - okay.

3    Hold on just a minute.

4        Q    Sure.

5        A    Okay.  If you look under A up here, this

6    is talking about a sex offender that has been deemed

7    a sexually violent predator by the - by a panel and

8    the court and he has to register and it's going -

9    best of my knowledge, that's what that's talking

10   about.  These are listing what - for a sexually

11   violent predator.  Okay.  Not all offenders - sex

12   offenders are released as sexually - are deemed

13   sexually violent predators, but I believe that's

14   what that's talking about.

15       Q    Okay.  Is sexual battery a sexually

16   violent predator?

17       A    No, not necessarily.  That's determined by

18   the court and an assessment panel, whether they fall

19   into that category.

20       Q    The reason why I'm asking this is, I'm

21   trying to understand where it comes from, the

22   Department of Correction's idea that you can't

23   release someone until they've got a Residence Plan.

24   Do you know where that comes from?

25       A    I believe that's probably the law.  I'm

1   not sure.  Like I said, that's department

2   regulations.  We cannot release a sex offender under

3   supervision without an approved Residence Plan.

4        Q    In less they hit their full time - full

5   term?

6        A    Unless they're full term, yeah.

7        Q    Now we're going to look at Exhibit Q.  Is

8   this Mr. Thomas's Sex Offender Residence Plan?

9        A    It is.

10       Q    And it's got the check marks at the bottom

11  for approved; is that right?

12       A    Correct.

13       Q    So when this form was done, his Residence

14  Plan was approved?

15       A    After it was submitted, yes, it was

16  approved, yes.

17       Q    Okay.  At the bottom there's a notation,

18  1215 Walthall.  Do you see that?

19       A    I see that.

20       Q    Is 12-15 the date that this was approved?

21       A    I am not sure.  I didn't - this was not

22  sent to me.  It would have been sent back to

23  Classification, so they handle that.

24       Q    Do you know when Mr. Thomas actually got

25  out?

1     A     I believe it was January the 13th.   Is

2   that right?

3     Q     Yeah, good memory.  So you and Brenda find

4   out towards the beginning of December that he's

5   eligible for immediate release pending a Residence

6   Plan, right?

7     A     Correct.

8     Q     And then he gets out January 13th --

9     A     Uh-huh. (yes)

10     Q     -- of the next year, so it took more than

11   a month for him to get out, once you found out he

12   was eligible for immediate release?

13     A     If that's what the dates say.

14     Q     So early December to January 13th, that's

15   more than a month?

16     A     Yes, it is.

17     Q     So why did it take more than a month for

18   him to get out --

19     A     Because, like I said, Classification had

20   to resubmit his Residence Plan.  I'm not sure what

21   date, but I think we can pretty well determine what

22   date that Classification sent it to us, because -

23   and he would have notified - they would have

24   notified our person here who orders the ID's, and

25   the ID - had ot have an ID, and they cannot order

1    the ID until he gets an approved Residence Plan,

2    so...

3        Q    So who would know when his Residence Plan

4    was approved?

5        A    Jesse Jimerson.

6        Q    Jesse Jimerson.  Okay.  Great.  I'm going

7    to talk to him later, so that's perfect.  Exhibit R,

8    you see this, it's an op ad by U.S. Senator John

9    Kennedy and Attorney General Jeff Landry dated March

10   8th, 2018.  Do you see that?

11       A    I do.

12       Q    Do you recall seeing this op ad?

13       A    No.

14       Q    Okay.  I'll read it with you.  In this op

15   ad, Senator Kennedy and AG Landry write, underneath

16   all of that is a layer of incompetence so deep that

17   the Corrections Department doesn't know where a

18   prisoner is on any given day of the week or when he

19   should actually be released from prison.  Do you see

20   that?

21       A    I do.

22       Q    Is that right?

23       A    No.  It might be in some cases, but, no,

24   I'd have to disagree with that.

25       Q    Okay.  So the AG has got it wrong here?

1    A    I don't agree with that.

2    Q    Based on your experience, there's not

3  that?

4    A    Correct.

5    Q    So we're getting close to the end.  And to

6  sum it up, Mr. Thomas spent more than a year and a

7  half at David Wade Correctional Center longer than

8  his court-ordered sentenced, correct?

9    A    Correct.

10    Q    But you don't think you made any mistakes?

11    A    No.

12    Q    Do you feel guilty about it?

13    A    I feel bad for him.  I don't feel guilty,

14  no, I don't, because I did what I thought was the

15  right thing to do.

16    Q    Does it keep you up at night?

17    A    No, it doesn't.  You know, I feel - like I

18  said, I feel bad.  I don't have anything against

19  these offenders.  If they're due for release, I want

20  them released, but I did not make a mistake.

21    Q    Is this the only time it's happened that

22  your choices resulted in someone being in prison

23  past their proper release date?

24    A    As best I can remember.  I don't recall.

25    Q    So this is the only time you can recall

1    this has ever happened?

2        A    In this situation, yes.

3        Q    What about any other situation in which

4    your actions resulted in someone being held past

5    their proper release date?

6        A    I don't - I don't recall any such case.

7        Q    Okay.

8        A    I've handled a lot of cases since I've

9    been here.

10                       MR. MOST:  Those are all the

11                       questions I have for you.  Do

12                       you have any, Gary?

13                       MR. EVANS:  Yeah.  Can we take a

14                       quick break, though?

15                       MR. MOST:  Sure, yeah.  Of

16                       course.  Let's go off the

17                       record.

18                          (OFF THE RECORD)

19    BY MR. MOST:

20        Q    So Ms. Gryder, you talked earlier about a

21    Uniform Commitment Order.

22        A    Correct.

23        Q    My understanding is that currently every

24    inmate gets one?

25        A    We're supposed to get one.  I can't

1 guarantee that we do get one on every offender.

2     Q    Mr. Thomas, who was sentenced back, I

3 believe, in 2013, he might or might not have had a

4 Uniform Commitment Order?

5     A    If it was not in his file, we did not get

6 a Uniform Commitment Order.

7     Q    And what does a Uniform Commitment Order

8 look like, does it say that at the top?

9     A    Yes.  I can - I can get you one.  Would

10 you like to see one?

11     Q    Yeah, yeah.  It doesn't have to be right

12 now, but --

13     A    Okay.  It can vary.  It's a - pretty much

14 a standard - now, some of the old cases, we have had

15 Uniform Commitment Orders, but it was totally

16 different from the ones we have now.

17     Q    Does it have a judge's --

18     A    It's a different form.  It's got the place

19 for the judge to sign at the bottom and it's just,

20 like I said, the pertinent information about the

21 sentence on it.

22     Q    So a Uniform Commitment Order always has a

23 judge's signature on it?

24     A    I'm not going to say it does.  In some

25 cases, it probably should, but it seems like I

1  recall some of the cases that it does not, it's not

2  signed by the - it should be signed by the judge or

3  it's stamped or whatever.

4      Q    Okay.  So if it's not in the - I'm sorry.

5  If it's not in Mr. Thomas's Master Record --

6      A    We did not get one.

7                  MR. MOST:  Okay.  Great.  That's

8                  all my questions.

9                  EXAMINATION

10 BY MR. EVANS:

11     Q    Hi, Ms. Gryder.  I have a few questions

12 for you.  You've talked at length, you and Mr. Most

13 have, about, I guess, the counts --

14     A    Correct.

15     Q    -- that Mr. Thomas was charged with, and I

16 just want to clarify for the record the effects that

17 those accounts have on his release date.

18     A    Okay.

19     Q    So what I want to do is, I'm going to

20 introduce this into the record.  I'll just do it as

21 D-1, so this will be marked as Exhibit D-1.  And Ms.

22 Gryder, do you recognize this document?

23     A    I do.

24     Q    And what is that document?

25     A    That is the Bill of Information for

1    De'Juan Thomas.

2        Q    Okay.  And to your knowledge, what is a

3    Bill of Information?

4        A    It lists the counts or the indictment for

5    the offender, the charges for the offender.

6        Q    Okay.  And in this of Mr. Thomas, what

7    factors went into his release date?

8        A    His jail credit, his - the offenses.  He

9    had three - actually three different types of

10   offenses and his sentence length on each one.

11       Q    Okay.  Let's kind of talk about those in

12   turn, and what I want to do is, I want to

13   specifically focus on, I guess, eligibility to earn

14   good time.

15       A    Okay.

16       Q    And so let's look at the first count as it

17   is on the Bill of Information, and that appears to

18   be the count of a second degree kidnapping, correct?

19       A    Correct.

20       Q    Tell me a little bit about how that charge

21   - how that affects the ability to earn good time.

22       A    That is an enumerated crime of violence.

23   As such, at the time, he had to serve eighty-five

24   percent of that sentence.

25       Q    Okay.  And look, briefly, at Exhibit I

1    just for the record where it says - well, it's

2    listed as count three on here, but it's second

3    degree kidnapping.  It appears that he was sentenced

4    to five years of hard labor.  Okay.  So on that, he

5    could earn - he had to serve eighty percent of that

6    sentence?

7         A    Eighty-five percent.

8         Q    Eighty-five percent, sorry.

9         A    Eighty-five percent.

10        Q    All right.  So kind of moving down the

11   list, count two, as it appears on the Bill of

12   Information, that is the --

13        A    That is the malfeasance.

14        Q    All right.  Tell me about the ability to

15   earn good time on that --

16        A    That is not enumerated crime of violence

17   and it's not listed under 142B as a sex offense, so

18   he earned regular good time on that.  At the time, I

19   believe in '13, was it, he was under 110 on that

20   one.  He had to serve forty percent of that one.

21        Q    And on the Sentencing Order, that is

22   listed as count one, which is also a five-year

23   sentence, --

24        A    Correct, correct.

25        Q    -- correct?  Okay.  So he had to serve

1   forty percent --

2       A    Forty percent.

3       Q    -- of that?

4       A    Correct.

5       Q    But because he had the kidnapping

6   conviction, he had to serve eighty-five percent of

7   that, correct?

8       A    Correct.

9       Q    All right.  And then on the Bill of

10  Information, going to the second page, this is the

11  third count, this is going to be the sexual

12  battery --

13      A    Correct.

14      Q    -- charge, correct?  All right.  So tell

15  me about the ability to earn to earn good time with

16  the sexual battery charge.

17      A    That is a sex offense listed under 14-2-B

18  and he had to serve one hundred percent of that.

19      Q    So no good time for --

20      A    With no good time.

21      Q    What about CTRP credits?

22      A    No.  Well, he - okay.  His sentences were

23  concurrent.  Okay?  And the time it was initially

24  done the Act 1099, kidnapping was controlling his

25  time, so he was eligible to earn the CTRP credit.

1   Okay.  Once his sentence was changed and the sexual

2   battery was in control then of his release date,

3   then he was not eligible for CTRP credit at that

4   point.

5        Q    I want to talk a little bit about that.

6   You mentioned that the kidnapping charge controlled.

7   What do you mean by that?

8        A    Okay.  His - he had a five-year, two-year

9   and a five-year.  Okay.  The - when his time was

10  first calculated, the 1099, five-year sentence, he

11  had to serve eighty-five percent.  It overrode the

12  Act 110 and the 1209, which was shown as two years,

13  so the five-year, under 1099, at eight-five percent

14  was controlling his release date.

15       Q    So the two-year sentence for sexual

16  battery had no bearing on his ability to earn good

17  time, because he had the longer kidnapping charge --

18       A    Correct.

19       Q    -- conviction?

20       A    Correct.

21       Q    Okay.  And just for the record, I

22  mentioned and I think Mr. Most mentioned before

23  CTRP.  What is that?

24       A    Certified Treatment and Rehabilitative

25  Credit.

1     Q     And what is that?

2     A     That's approved courses that - where an

3  offender can earn a maximum of three hundred and

4  sixty days off of his release date.

5     Q     And how does that work - how does that

6  interplay with the accumulation of good time

7  credits?

8     A     That - well, that comes off of the good

9  time date, not the full term.  It doesn't affect the

10  full-term date, but if he earns the - each course is

11  assigned a different amount of good time that he can

12  earn.  If he completes a ninety-day course, then he

13  get ninety days - if he's eligible for the credit,

14  he gets nine days off his release date.  Pre-release

15  is one that's a hundred and twenty days.  If they

16  earn a hundred and twenty days, they get a hundred

17  and twenty days off of their release date up to a

18  maximum of three hundred and sixty days for all

19  offenders.

20     Q     Got you.  Just so I'm clear, so - and this

21  is kind of a hypothetical, I guess I should say, but

22  if an offender - or if an individual is convicted of

23  five years in prison, then - you mentioned full-term

24  date.  That would be the five years from the date of

25  conviction, correct?

1    A    Correct.

2    Q    But certain individuals are eligible to

3  earn good time credits, which reduces that sentence,

4  correct?

5    A    Correct.

6              MR. MOST:  Objection as to the

7              form of the question.  Just a

8              clarifying point, I think full

9              term includes jail credit, so it

10             wouldn't be from the sentencing

11             date.

12             MR. EVANS:  Fair enough.  Yes.

13   A    Correct.

14   Q    Including credit for time served?

15   A    Correct.

16   Q    And so - but the offenders are eligible to

17  earn good time, which reduces - or shortens the

18  release date?

19   A    Correct.

20   Q    And just so I'm clear, so your testimony

21  is the CTRP credits can further reduce the release

22  date, based upon whatever the good time release date

23  is?

24   A    Correct.

25   Q    I just wanted to clarify that for the

1    record.  So now I want to talk about, I guess, the

2    different calculations that ultimately kind of came

3    about for Mr. Thomas.

4         A    Okay.

5         Q    So in 2013, the sentencing order reflects

6    that it was a five-year sentence for the malfeasance

7    and the kidnapping charge and a two-year sentence

8    for the sexual batter?

9         A    Correct.

10        Q    And with good time and any other credits,

11   you know, credit for time served, his release date

12   was calculated to be 2015?

13        A    Not at that time.

14        Q    Initially?

15        A    Initially, he didn't have the credits and

16   he wasn't getting all of his jail credit he was

17   entitled to and the time was initially done at

18   another institution.

19        Q    I understand.  But, ultimately, his time

20   ended up being June, 2015?

21        A    Correct.

22        Q    But that calculation changes if the sexual

23   battery was a five-year sentence, correct?

24        A    Correct.

25        Q    And why is that?

1     A    Because sexual battery is under Act 12:09.

2    Act 12:09 does not earn any good time, including

3    CTRP credit.

4     Q    So if his sexual batter conviction was

5    five years, then his release date would have been

6    February of 2017?

7     A    Correct.

8     Q    So in 2015, when - that's when you

9    testified you initially - when you checked to make

10    sure his release date was correct; is that right?

11    A    Right.

12    Q    So if his release date would have actually

13    been in 2017, then his release in June of 2015 would

14    be a year and a half early; is that correct?

15    A    Right.

16    Q    Is it important for the Department of

17    Corrections to not release offenders before their

18    release date?

19    A    Absolutely.

20    Q    And why is that?

21    A    Because they - you know, if - they have a

22    release date and if they release too early and they

23    get out and they commit another offense and they

24    injure somebody or they kill somebody, then we could

25    be, you know, in trouble.

1    Q    So you testified earlier that upon

2  checking his release date, you wanted clarification

3  about his actual sentence?

4    A    Yes.

5    Q    Okay.  Now, and you testified, in order to

6  clarify his actual sentence, you contacted the

7  District Attorney's Office, correct?

8    A    I did.

9    Q    Okay.  Do you recall who you contacted

10  with the District Attorney's Office?

11    A    I believe his name was Donald Cassel.  I

12  know his name was Donald Cassel.  I'm not sure I'm

13  pronouncing that right, but...

14    Q    I'll show you an exhibit, which I'll mark

15  as D-2.  I'll hand this to opposing counsel to take

16  a look at it.  Ms. Gryder, do you recognize this

17  document?

18    A    Yes, I do.

19    Q    And what is it?

20    A    That is emails to - that he sent to me,

21  this last one that he sent to me in response to my

22  email to him.  That was the last one, I believe.

23    Q    And what - you're talking about on the

24  first page?

25    A    Okay, first page.

1      Q     I'm sorry.  The top page being the first

2   page.

3      A     Okay.  This is his email to me in response

4   to an email I sent to him.

5      Q     And I'm going to show you - this would be

6   the last page.  Do you recognize this email?

7      A     Yes, I do.

8      Q     And what email is that?

9      A     That is the initial email I sent to Mr.

10  Cassel to ask for clarification.

11     Q     Okay.  If you wouldn't mind, would you

12  please read that email for the record?

13     A     This offender plead guilty and was

14  sentenced 1-25 of '13 for malfeasance in office,

15  second degree kidnapping and sexual battery.  The

16  Bill of Information shows count one to be second

17  degree kidnapping, count two is malfeasance in

18  office and count three is sexual battery.  The

19  sentencing minutes of 1-2-13 show count one to be

20  14:134.1, which was the kid - I mean, the

21  malfeasance.  Count two is 14:43.1, which would be

22  the sexual battery, and count three is 14:44.1,

23  which is the kidnapping.  The minutes reflect that

24  he received five years for counts one and three and

25  two years for count three.  As a result of the

1  statutes being listed in a different order from the

2  Bill of Information, he is serving only two years

3  for the sexual battery charge and he's serving five

4  years for the malfeasance charge.  He is due to

5  release on 6-5 of '15, however, if he did indeed

6  receive a five-year sentence for the sexual battery,

7  rather than the two, as the minutes reflect, he will

8  not be due for release until 2-28 of '17.  Thank you

9  for helping to clarify this offender's sentence.

10  You can fax me, and I put my phone number, or call

11  me.

12      Q    And so why did you send this email to Mr.

13  Cassel or Cassel.

14      A    I called the District Attorney's Office

15  and the lady - my remembrance of the situation was

16  that I talked to a lady there that answered the

17  phone and she is the one that gave me his email

18  address and told me, you know, that I could contact

19  him.

20      Q    Okay.  And just in case you hadn't already

21  said it, what was the date of this email?

22      A    It was May the 5th, 2015.  No - is that

23  right?  No, that's the date I - yeah, May the 5th,

24  2015.

25      Q    Now I'm going to show you a document which

1   I'll mark as D-3.  All right.  Now, Ms. Gryder, do

2   you recognize this document?

3         A     Yes, I do.

4         Q     And what is this document?

5         A     This is the - from Docket Master, the

6   sentencing court minutes from Docket Master, yes,

7   for De'Juan Thomas.

8         Q     Okay.  And I'll just read this for the

9   record and you can follow along, or I'll read

10  pertinent parts of it.  On the third sentence it

11  says, the counts are listed incorrectly within the

12  minute entry of 1-25-13, however, the sentence

13  listed is correct.  The defendant pled guilty and

14  was sentenced on 1-25-13.  As to count one, which is

15  RS 14:44.1, five years DOC.  Now, which conviction

16  is the 14:44?

17        A     That's the kidnapping.

18        Q     That's kidnapping.  Okay.  And then it

19  says, count two, RS 14:134.1, two years, DOC.

20        A     That's the malfeasance.

21        Q     Malfeasance.  And then count three, RS

22  14:43.1, five years, DOC.

23        A     That's the sexual battery.

24        Q     Okay.  Now, going back to D-2, I'm going

25  to direct your attention to this page three.  It

1    looks to be an email at the bottom of that page,

2    appears to be dated May the 11th, 2015.  Do you

3    recognize that email?

4         A    Yes, I do.

5         Q    And what is that email?

6         A    You want me to read it?

7         Q    Please.  Yeah.

8         A    Okay.  Good morning.  I just pulled up

9    this offender's court minutes on Docket Master and

10   read the minute entry for 5-7 of '15.  According to

11   the minutes, he did receive five years for the

12   sexual battery and two for the malfeasance.  I just

13   want to verify that with you before changing his

14   time and informing him.  I feel sure he knows his

15   time is wrong, but he was just a few days from

16   getting released.  Thank you so much for your help

17   with this.

18        Q    Okay.  And it looks like this - and

19   correct me if I'm wrong, that this email was dated

20   12:04 p.m., correct?

21        A    Correct.

22        Q    Now, up to this date, Ms. Gryder, had Mr.

23   Thomas's release date been recalculated?

24        A    No.

25        Q    So, now, look at the top of the page.  Do

1   you recognize that email?

2        A    Yes.

3        Q    And what is that email?

4        A    That is from Donald Cassels, responding to

5   my email earlier and he said, Dear Ms. Gryder, the

6   updated minute entry is correct.  I can send you a

7   certified copy, if that would be helpful.

8        Q    And so your testimony earlier - well, I

9   guess - so let me ask you.  Now, following this

10  email, when did you recalculate Mr. Thomas's release

11  date?

12       A    I'd have to look at the date.  I may have

13  done it that day, I'm not sure, but I may have done

14  it that day.

15                    COURT REPORTER:  I need to stop

16                    you just for a second.

17                    MR. EVANS:  Sure.

18                    (OFF THE RECORD)

19  BY MR. EVANS:

20       Q    Okay.  Ms. Gryder, so earlier you

21  testified that you were concerned that because there

22  was an apparent conflict between the counts as they

23  were listed on the Bill of Information and the

24  counts as they were listed on the Sentencing Order,

25  you wanted to seek clarification to make sure the

1    sentences were correct; is that right?

2       A    Correct.

3       Q    Now, after you noticed what you thought to

4    be the discrepancy between the Sentencing Order and

5    the Bill of Information, did you recalculate Mr.

6    Thomas's sentence at that time?

7       A    No, I did not.

8       Q    And why not?

9       A    Because I didn't have documentation.  I

10   asked for clarification.  You're talking about when

11   I initially noticed the --

12      Q    Uh-huh. (yes)

13      A    No, I did not, because I wanted - that's

14   why I sought clarification.

15      Q    Okay.  And so, now, after you received the

16   May 7th, 2015 minutes, did those minutes provide the

17   clarification that you were seeking?

18      A    They did, but I still wanted further

19   clarification from the - I guess, for my - I don't

20   relish change in an offender's time when he's about

21   to go home.  That's not a fun thing to do.

22      Q    Okay.  And, same question, but after the

23   May 11th email from Mr. Cassel saying the updated

24   minute entry is correct, were you - did that provide

25   the clarification that you were seeking?

1      A    Yes, I felt comfortable at that point that

2 these - that I did have the correct information to

3 change his time.  I could have changed it - if I had

4 not had the email, I could have changed it, I just -

5 for my own benefit, I wanted clarification from the

6 District Attorney.

7      Q    Okay.  I just wanted to clarify, last

8 couple of questions that I had for you.  You

9 mentioned earlier - or you talked a little bit about

10 December, 2016 when Mr. Thomas, I believe, forwarded

11 this transcript of the 2013 sentencing, --

12     A    Uh-huh. (yes)

13     Q    -- correct?  You talked a little bit about

14 the involvement that you had in processing Mr.

15 Thomas out.

16     A    Correct.

17     Q    But just for the record, what involvement,

18 specifically, did you have from the point that Mr.

19 Thomas sent the - the sentencing transcript to his

20 release date?

21     A    I prepared his release documents and put

22 him on call-out and processed him release.

23     Q    So let's talk about those just a little

24 bit.  What kind of paperwork is required to be

25 processed before an offender is released?

1    A    We do a checklist where he's taken to -

2    each department has to sign off on that he's been

3    processed through that department.  It begins with

4    the Records Office and I do his - prepared his

5    certificate.  I prepared his Disposition of Property

6    Notice where it shows his address that he's

7    releasing to and how he's - I write on there how

8    he's going to go home, and, like I said, and his

9    certificate, and in his case, being a sex offender,

10   I have sex offender notification paperwork to

11   prepare that the offender has to sign and along -

12   you know, and I had to put him on Offender Watch,

13   which is a national sex offender database.

14   Q    Okay.  And so you talked at length earlier

15   about, I guess, the fact that the sex offender has

16   to have the approved Residence Plan before - prior

17   to release.

18   A    Correct.

19   Q    Did you have any involvement with that,

20   with Classifications or with Probation or Parole?

21   A    No.

22              MR. EVANS:  I think that's all

23              the questions I have.

24              MR. MOST:  I've got a couple of

25              follow-ups, if that's all right.

1          MR. EVANS:  Yeah, that's okay.

2                   EXAMINATION

3   BY MR. MOST:

4       Q    So Ms. Gryder, we were talking - you were

5   talking to Mr. Evans about good time calculation?

6       A    Correct.

7       Q    And so under a certain act, an inmate

8   might have to serve eighty-five percent of their

9   sentence?

10      A    Correct.

11      Q    This is a question about the order in

12  which it gets calculated.  So do you take - let's

13  say they have a five-year sentence.  Do you take off

14  the jail credit and then take eighty-five percent of

15  the remainder or do you take the five-year sentence,

16  take eighty-five percent and then subtract the jail

17  credit?  Does that make sense?

18      A    I know what you're asking.  You take

19  eighty-five - take the - we do it differently now,

20  but he has to serve eighty-five percent of that

21  sentence, so if you take eighty-five percent and

22  take any jail credit off and then take - or take the

23  total sentence length, take the jail credit off and

24  then eighty-five percent of that balance, or you can

25  do it two ways.  Take the whole - the sentence

1  length, eighty-five percent of that, minus his jail

2  credit he's already served, take that amount and add

3  it to his sentence date.

4      Q    So you do - take the sentence, then

5  eighty-five percent of that, then take off jail

6  credit?

7      A    Well, we don't do hand comp.  That's all

8  done - I mean, the computer does that.  We just put

9  the information in, but that's the way, basically,

10  it works.

11      Q    And do you know which way the computer

12  does it?  Because it results in different answers.

13      A    The old way, I know it took the - like the

14  total sentence length minus the jail credit minus

15  the good time he earned on the jail credit off and

16  then the balance, whatever he owed on that balance,

17  that was the balance, the must-serve, what we call

18  the must-serve.

19      Q    So that was the old way and then they

20  changed it?

21      A    Now, since 2012, they came up with Act

22  110, it started like forty percent - Act 110 was

23  forty percent, so what we did, take the total

24  sentence length and always - if I do it by hand, I

25  take the total sentence length, take - times forty

1 percent, say, and then take the jail credit off of

2 that, take that amount and add it to his sentence

3 date, if I were doing it by hand calculation.

4    Q    That answers my question.  Thank you.  So

5 earlier you testified you don't think you made any

6 mistakes with regard to Mr. Thomas; is that correct?

7    A    No, I don't.

8    Q    So if the same scenario presented itself

9 today, would you take the same steps?

10    A    I certainly --

11              MR. EVANS:  Object to form.  I'm

12              sorry.  Object to form.  Now you

13              can answer.

14    A    Yes, I would.  If I thought I - any time I

15 think I need clarification, I'm going to seek it.

16    Q    And then if that clarification results in

17 an discrepancy between the court minutes on Docket

18 Master and the judge's signed Sentencing Order,

19 you're going to recalculated their sentence based on

20 the minutes?

21    A    Based on the amended minutes, because they

22 override the last - like you said, it's the last

23 order of the court.

24    Q    Earlier you testified that if there's a

25 discrepancy between Docket Master minutes and a

1    signed order of the court, the signed order

2    controls, is that --

3        A    It should not be - I will say again, it

4    should not be.  They should be the same.  I've not

5    run into that where - I don't recall ever running

6    into that, where the order of the court - or what we

7    call Sentencing Minutes is different from Docket

8    Master.

9        Q    But in De'Juan Thomas's case, they were

10   different and you had a signed order of the court

11   saying sexual battery two - I mean, you had minutes

12   that said sexual battery, five years, right?

13       A    And those last minutes overrode that

14   order, yes, they did, because that was the last

15   order of the court.

16       Q    It's not what you testified earlier.  You

17   testified earlier that a signed order of the court

18   controls over the minutes.

19       A    When that - amended - when they amend -

20   any time they amend minutes, we don't necessarily

21   get a signed order from the court.  If it's amended,

22   we get amended minutes.  We have to change time,

23   because the date he got - the minutes go amended

24   after the Sentencing Order, so I have no way of

25   believing that those amended minutes are wrong.

1    Minutes get amended, minutes do, from time to time,

2    get amended.

3        Q    And so you trust the minutes over a signed

4    Sentencing Order?

5        A    In that case, I have to use - I have to

6    use the latest minutes.

7        Q    Because you think the minutes are more

8    reliable than a signed order of the court?

9        A    Okay.  When those minutes go amended in

10   '15, that original Sentencing Order was no longer in

11   effect, because that was the - that was done after

12   the signed order of the court.

13       Q    So would that be true, if the judge - if

14   it was a - does it matter whether it was a minute

15   clerk who did it or a judge who did it?

16       A    I have no - now, the minute, clerk, I

17   assume, does the amended minutes.  I have no way of

18   knowing if that judge did or did not order that.

19   There was a hearing held and I have no - I don't

20   have any idea what took place in Orleans Parish.  I

21   cannot testify to that.

22       Q    Okay.  So let's look at Exhibit D-3.  The

23   May 7, 2015 minute entry says, the minute clerk on

24   this date took notice that the minute entry 01-25-13

25   is in error, correct?

1      A    Correct.

2      Q    So this is - is there any indication that

3  the judge corrected this or that it was the clerk

4  who corrected it?

5      A    I don't know who was at the hearing.  Was

6  the judge at the hearing?  I don't know that.  I'm

7  not - I don't go to court, so I don't know when they

8  have a status hearing, who is there.  I would assume

9  the judge is there.  Was the judge there at that

10  time, on May 7th of '15?

11      Q    Does it indicate here who took notice that

12  there was a previous error?

13      A    It says, took notice - no, the minute

14  clerk on this date took notice that the minute entry

15  was in error - is in error.

16      Q    Does it say anywhere on here that the -

17  the judge took notice of an error?

18      A    No.

19      Q    Okay.  So I understand you trust a

20  subsequent order of the judge over a previous order

21  of the judge, right?

22      A    This one - this was put out - or

23  corrected.  That overrode that.  That overrode those

24  minutes or whatever we had, because this was done

25  after.  We have to use that.  I had not choice but

1  to correct his time.

2      Q    This May 7th, 2015 minute clerk taking

3  notice that a previous minute entry was an error

4  controls over a signed Sentencing Order by a judge?

5      A    Yes, in this case, yes.  It overrode - it

6  overrode these minutes, the minutes that we

7  initially calculated his time with, yes, because it

8  was done after that, so...

9      Q    I understand that subsequent minutes

10  control over previous minutes.

11      A    Correct.

12      Q    Does a minute clerk entry control over a

13  signed order by a judge?

14      A    Yes, as far as doing time calculations, I

15  would have to say yes.

16      Q    Only a judge can issue an order of the

17  court, correct?

18                      MR. EVANS:  Object to form.  You

19                      can answer.

20      A    My knowledge of that - I've got limited

21  knowledge.  I would think that the judge is the one

22  that issues the orders, yes.

23                      MR. MOST:  Okay.  That's all my

24                      questions.  We can close this

25                      deposition.

1         (DEPOSITION CONCLUDED AT 12:35 P.M.)

2

3

4                   CERTIFICATION

5

6         I, Lorrie Joles, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this

7  proceeding was taken, do hereby certify that, SALLY GRYDER, after having been first duly sworn by me upon authority of

8  R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 126 pages; that this testimony was reported by me

9  in the stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and

10  it is a true and correct transcript to the best of my ability and understanding, that the transcript has been

11  prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have

12  acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil

13  Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the

14  parties herein, nor am I otherwise interested in the outcome of this matter.

15

16         In witness whereof, I hereunto affix my signature at Shreveport, Louisiana, this the 8TH day of DECEMBER, 2018.

17

18

19

20

21             _____
                    Lorrie Joles
              Certified Court Reporter

22                No. 91185
              State of Louisiana

23

24

25