## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DE'JUAN THOMAS** | : | **CIVIL ACTION** |
| | : | **NO. 17-1595-SDD-EWD** |
| **VERSUS** | : | **JUDGE SHELLY D. DICK** |
| **SALLY GRYDER, ET AL.** | : | **MAGISTRATE JUDGE ERIN WILDER-DOOMES** |

**************************************************************************

<u>**MEMORANDUM IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT**</u>

**MAY IT PLEASE THE COURT:**

This is an action brought by the De'Juan Thomas ("Plaintiff"), against defendants James LeBlanc, Jerry Goodwin, and Sally Gryder, employees of Louisiana Department of Public Safety & Corrections ("DPS&C").[1] For the reasons discussed below, Plaintiff's §1983 claims against defendants LeBlanc, Goodwin, and Gryder should be dismissed because there are no genuine issues of material facts as to critical elements of Plaintiff's claims. Specifically, defendants are entitled to summary judgment because (1) his claims are barred by the principles set forth in the United States Supreme Court case *Heck v. Humphrey* and its progeny, (2) the defendants are entitled to qualified immunity, and (3) Plaintiff lacks standing to brings claims for injunctive relief.

### I.    STATEMENT OF THE CASE

A.  <u>Factual Background</u>

On January 25, 2013, Plaintiff pleaded guilty in Orleans Criminal District Court, where he was sentenced pursuant to three (3) convictions:

Count 1: Sexual Malfeasance in Prison (La. R.S. §14:1341.1) – Five (5) Years;

---

[1] R. Doc. 1.

1

Count 2: Sexual Battery (La. R.S. §14:43.1) – Two (2) Years;

Count 3: Second Degree Kidnapping (La. R.S. §14:44.1) – Five (5) Years.[2]

These charges were designated to run concurrently, with credit for time served.[3]

Upon his incarceration, defendant Sally Gryder, an employee of David Wade Correctional Center responsible for calculating offender release dates, recalculated Plaintiff' release date on four occasions.[4] The first recalculation gave Plaintiff credit for time served.[5] The second and third recalculations gave Plaintiff Certified Treatment and Rehabilitation Program ("CTRP")[6] and "good time" credits, which gave Plaintiff' a good time release date[7] of June 25, 2015.[8] The fourth recalculation by Gryder, in May 2015, is the primary action at issue in this case.[9]

On May 5, 2017 (and as Plaintiff's June release date approached), Ms. Gryder sent an e-mail to Donald Cassels with the Orleans Parish District Attorney's Office in which she inquired about a discrepancy between the sentencing minutes and the bill of information.[10] She also spoke with the Assistant DA, who told her that Plaintiff got five years on the sexual battery conviction, but she still did not recalculate Plaintiff's release date.[11] On May 7, 2015, the minute clerk with the Orleans Parish Clerk issued a minute entry that read in pertinent part that "the minute clerk on this date, took notice that the minute entry 01/25/13 is in error. The counts are listed incorrectly

---

[2] Exhibit 22.
[3] *Id.*
[4] Ms. Gryder did not perform the initial calculation of Plaintiff's release date. Exhibit 1, 49:5-51:18.
[5] *Id*, 50:21-23.
[6] CTRP credits are obtained by taking approved courses, which can provide a reduction of sentence by up to three hundred and sixty-five days off of an offender's release date. Exhibit 1, 106:21-107:19.
[7] For ease of use, Defendants will refer to this diminution of sentence release date as Plaintiff's "good time date."
[8] Exhibit 1, 50:24-51:4. Without these credits, Plaintiff's "full term" release date was February 28, 2017. This is an important date because, as discussed below, the events occurring in 2015 led Sally Gryder to believe that his legal release date was in fact his full-term date.
[9] *Id.* 51:5-11.
[10] Exhibit 8.
[11] Exhibit 1, 53:24-54:2.

within the minute entry of 01/25/13. However, the sentence listed is correct."[12] The amended

minute entry went on to reflect that Plaintiff's sentence as the following:

>    Count 1: Second Degree Kidnapping (La. R.S. §14:44.1) – Five (5) Years;
>
>    Count 2:  Sexual Malfeasance in Prison (La. §14:134.1) – Two (2) Years;
>
>    Count 3: Sexual Battery (La. R.S. §14:43.1) – Five (5) Years.[13]

This change reflected in the May 7, 2015 minutes fundamentally affected Plaintiff's good time

release date, as a sentence for sexual battery is not eligible for any "good time" reductions, meaning

that Plaintiff was no longer eligible for release in June 2015.[14] Under this sentencing framework,

Plaintiff's correct release date would have been February 28, 2017 (his full term release date), *not*

his good time release date of June 5, 2015.[15]

After seeing the May 7, 2015 amended minutes, Ms. Gryder sent an e-mail to Donald

Cassels with the Orleans Parish District Attorney's Office on May 11, 2015, which read:

>    Good morning – I just pulled this offender's court minutes on Docket
>    Master read the minute entry for 5/07/15. According to the minutes, he did
>    receive 5 years for the sexual battery and 2 for the Malfeasance. I just want
>    to verify that with you before changing his time and informing him. I feel
>    sure he knows his time is wrong, but he was just a few days from getting
>    released.[16]

In response to this e-mail, Mr. Cassels replied "[t]he updated minute entry is correct. I can send

you a certified copy, if that would be helpful.[17] Accordingly, Ms. Gryder recalculated Plaintiff'

release date, for the fourth time, to a full term release date of February 28, 2017.[18]

---

[12] Exhibit 23.
[13] *Id*. This is also the count order in which they are addressed in the amended minute entry.
[14] Exhibit 1, 44:16-18 ("sexual battery does not earn good time").
[15] *Id*, 57:5-17.
[16] Exhibit 8.
[17] *Id.*
[18] Exhibit 1, 51:5-8; Exhibit 9, p. 3.

Following his cancelled release date, Plaintiff sent Gryder a letter, requesting a meeting to "further discuss my refusal of release from this institution."[19] On June 26, 2015, Gryder responded to Plaintiff and informed him "[y]ou are now serving your time flat and will full-term out on 02.28.2017."[20] Plaintiff then responded with a letter on June 28, 2015.[21] On August 7, 2015, Ms. Gryder responded to Plaintiff and informed him that she did not change his sentence until after receiving written verification from the District Attorney's office and a corrected minute entry from the sentencing court.[22] She also informed him that "unless this office receives additional information from Orleans Parish contrary to what we have, your sentence will remain the same."[23]

Plaintiff also wrote a letter to Warden Jerry Goodwin.[24] Defendant Goodwin forwarded this letter to Brenda Acklin, Gryder's supervisor, and spoke with both Gryder and Acklin about Plaintiff.[25] Acklin drafted a response to Plaintiff which stated that "your time was adjusted correctly by Ms. Gryder and the minutes from Orleans Parish are attached for your information."[26] This letter was reviewed and signed by Goodwin prior to being sent to Plaintiff.[27]

Plaintiff filed a motion for correction of illegal sentence with the Orleans District Court. On July 28, 2016, Judge Graham Bosworth issued an order wherein the Court states in pertinent part that "the defendant states there is an incorrect minute entry and his sentence is incorrect. This is correct, however on January 25, 2013 this matter was corrected through a corrective minute entry."[28] The Court went on to say that "the defendant's assertions are correct with regard to his

---

[19] Exhibit 9, p. 4.
[20] *Id*, p. 3.
[21] *Id*, p. 2.
[22] *Id*, p. 1.
[23] *Id.*
[24] Exhibit 10.
[25] Exhibit 4, 23:20-24:13.
[26] Exhibit 10.
[27] *Id*; Exhibit 4, 23:20-24:3.
[28] Exhibit 11.

sentence, however the incorrect entries have been amended with the correct minute entries. As such this motion is denied as being moot."[29] Defendant Gryder testified that she did not recall seeing this this document until after litigation commenced.[30]

On or around November 18, 2016, Plaintiff sent a letter to defendant Gryder wherein he states that he received court documents "supporting my claims of having (two) 2 years to serve on the sexual battery charge. I will present to you the stated and time given to me on January 25, 2013."[31] In November 2016, Plaintiff also filed an administrative remedy procedure ("ARP") with DWCC officials, complaining that he had been over detained since his actual release date of June 15, 2015.[32]

On December 5, 2016, Plaintiff sent a letter to Brenda Acklin, as well as a copy of the sentencing transcript.[33] From this point, Ms. Acklin handled Plaintiff' case, except for (1) Gryder sending On December 8, 2016 e-mail to Donald Cassels requesting an updated minute entry,[34] and (2) Gryder processing him for release in January 2017.[35] On December 13, 2016, Plaintiff sent a follow up letter to Ms. Acklin.[36] On December 14, 2016, Jesse Jimerson with David Wade's Classification Department sent an e-mail to the Division of Probation & Parole requesting that a new residence plan be approved.[37]

On December 23, 2016, Brenda Acklin issued a first step response to Plaintiff's ARP, and informed him that his time had been recalculated, and that he was being placed in UNSORP

---

[29] *Id.*
[30] Exhibit 1, 73:2-22.
[31] Exhibit 12.
[32] Exhibit 15, pp. 9-10.
[33] Exhibit 13.
[34] Exhibit 8, pp. 1-2.
[35] Exhibit 1, 77:21-15.
[36] Exhibit 13.
[37] Exhibit 14.

status.[38] On January 3, 2017, Plaintiff's approved residence plan was sent to DWCC.[39] On January 6, 2017, a State ID was requested and ordered for Plaintiff, which was issued on January 6, 2017[40] and received on January 11, 2017.[41] Between January 5 and Plaintiff's release on January 13, DWCC continued to process release paperwork.[42] Plaintiff was then released from DWCC on January 13, 2017.[43] Following his release, Plaintiff spent approximately one (1) month on parole before being released from supervision in February 2017.[44]

B. Pertinent Procedural Background

Plaintiff filed the instant lawsuit on November 4, 2017.[45] In the initial *Complaint,* Plaintiff asserted claims pursuant to 42 U.S.C. §1983 and Louisiana state law. On January 31, 2018, the defendants filed a *Motion for Summary Judgment,* wherein they sought dismissal on prescription grounds.[46] On August 31, 2018, the Court granted defendants' motion in part, and dismissed Plaintiff's claims arising under Louisiana state law. [47] As a result of the Court's *Ruling,* only Plaintiff's §1983 claims remain.[48]

Defendants, James LeBlanc, Sally Gryder, and Warden Jerry Goodwin now appear in this *Motion for Summary Judgment.*

---

[38] Exhibit 15. UNSORP is short for "unapproved sex offender residence plan." Exhibit 3, 13:13-14.
[39] Exhibit 16.
[40] Exhibit 18. Both Sally Gryder and Brenda Acklin testified that the state ID was needed prior to Plaintiff's release. Exhibit 1, 89:5-11; Exhibit 2, 29:13-30:1.
[41] Exhibit 17; Exhibit 2, 34:23-25; Exhibit 17, p. 2.
[42] Exhibit 19.
[43] *Id*, p. 4.
[44] Plaintiff's brief time on parole supervision was due to his full term release date being February 2017. Exhibit 20.
[45] R. Doc. 1.
[46] R. Doc. 13.
[47] R. Doc. 39.
[48] *Id.*

## II.    ANALYSIS

### A.  Summary Judgment - Standard

Pursuant to well-established legal principles, summary judgment is appropriate where there is no genuine disputed issue as to any material fact and the moving party is entitled to judgment as a matter of law.[49] Supporting affidavits must set forth facts which would be admissible in evidence, and opposing responses must set forth specific facts showing that there is a genuine issue for trial. If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can show a reasonably jury that it is entitled to a verdict in its favor.[50]

This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[51]  Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial.[52] Summary judgment is appropriate in any case where the evidence is so weak or tenuous on essential facts that the evidence could not support a judgment in the favor of the non-moving party.[53] In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes.[54]

---

[49] FED. R. CIV. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).

[50] *Anderson,* 477 U.S. at 258.

[51] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[52] *Celotex Corp. v. Catrett*, 47 U.S. 317, 322 (1986).

[53] *Little*, 37 F.3d at 1076.

[54] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1994), *cert. denied*, 502 U.S. 1059 (1992).

The defendants in this matter satisfy their initial responsibility in moving for summary judgment by informing the Court of the basis for their motion through *the Statement of Undisputed Facts* and the attached exhibits.  The attached exhibits are as follows:

Exhibit 1:   Deposition of Sally Gryder
Exhibit 2:   Deposition of Brenda Acklin;
Exhibit 3:   Deposition of Jessie Jimerson;
Exhibit 4:   Deposition of Jerry Goodwin;
Exhibit 5:   DPS&C Regulation No. B-04-004;
Exhibit 6:   DPS&C Regulation No. B-02-018;
Exhibit 7:   DPS&C Regulation No. B-08-009;
Exhibit 8:   May 2015 & December 2016 E-Mail Chain between Gryder and Donald Cassels;
Exhibit 9:   2015 correspondence between Plaintiff and defendant Gryder;
Exhibit 10:  2015 Correspondence Between Plaintiff and defendant Goodwin;
Exhibit 11:  July 28, 2016 Order;
Exhibit 12:  November 18, 2016 letter from Plaintiff to defendant Gryder;
Exhibit 13:  December 2016 letters from Plaintiff to Brenda Acklin;
Exhibit 14:  December 2016 e-mails from Jesse Jimerson;
Exhibit 15:  Plaintiff's ARP Request and ARP Responses;
Exhibit 16:  January 3, 2017 e-mail;
Exhibit 17:  Discharge Documents;
Exhibit 18:  Plaintiff's State Issued Identification Card;
Exhibit 19:  Plaintiff's Release Paperwork;
Exhibit 20:  Probation & Parole Narratives;
Exhibit 21:  Bill of Information;
Exhibit 22:  Sentencing Order;
Exhibit 23:  Docket Master Sheet.

## III.   PLAINTIFF'S CLAIMS ARE BARRED BY HECK v. HUMPHREY

The very first substantive paragraph of Plaintiff's *Complaint* alleges that "Defendants *illegally imprisoned [Plaintiff] for 589 days past the end of his sentence*."[55] As result of this alleged illegal confinement, Plaintiff seeks damages, declaratory, and injunctive relief.[56] Because

---

[55] R. Doc. 1, ¶1.
[56] *Id*, ¶19.

Plaintiff's claims bear directly on the nature and duration of his confinement, they are barred by the doctrine set forth in *Heck v. Humphrey* and its progeny, and should be dismissed with prejudice.

    A.  <u>Legal Framework</u>

    In *Heck v. Humphrey,* the United States Supreme Court held that a prisoner's §1983 claims is not cognizable where "a judgment in favor of the Plaintiff would necessarily imply the invalidity of his conviction or sentence.[57] Before a court can entertain such a claim in a §1983 action, the individual must show that his conviction or sentence has been overturned or called into question in a separate proceeding, such as a habeas corpus proceeding.[58]

    However, *Heck* is but one in a line of Supreme Court cases delineating the circumstances in which a prisoner may challenge his confinement in a §1983 action. In *Wilkinson v. Dotson*, the Supreme Court analyzed its precedent from *Preiser v. Rodriguez*,[59] *Wolff v. McDonnell*,[60] *Heck,* and *Edwards v. Balisok*[61] and noted that:

> "these cases, taken together, indicate that a state prisoner's §1983 action is barred (absent prior invalidation – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to a conviction or internal prison proceedings)—if success in that action would *necessarily demonstrate the invalidity of confinement or its duration*."[62]

Therefore, the starting point in the instant analysis is whether success on Plaintiff's claims would necessarily demonstrate the invalidity of his confinement, or its duration.

---

[57] 512 U.S. 477 (1994).
[58] *Damond v. LeBlanc,* 2013 U.S. Dist. LEXIS 95586, *12 (M.D. La. 6/18/2013)(citing *Heck*).
[59] 411 U.S. 475 (1973).
[60] 418 U.S. 539 (1974)
[61] 520 U.S. 641 (1997).
[62] 544 U.S. 74, 81-82 (2005)(emphasis added).

B.  Plaintiff's Claims Bear on Both the Invalidity of His Confinement and the Duration
    of His Confinement

Plaintiff alleges in this litigation that he has been subjected to an illegal confinement, specifically, that he was imprisoned 589 days past his release date.[63]

In order for Plaintiff to succeed in this litigation, he *must* show that his confinement was illegally extended past his release date. Thus, Plaintiff necessarily must invalidate both the nature and duration of his confinement. Indeed, by proving his case, Plaintiff would inherently invalidate (1) the *nature* of his confinement was illegal (that the defendants had no authority to hold him), and (2) the *duration* of his confinement was illegal (he was held for 589 days past his release date). For this reason, *Heck* is triggered, and bars Plaintiff's §1983 claims against the defendants unless he can show that his confinement has previously been invalidated.

C.  There is No Indication that Plaintiff's Confinement has been Previously Invalidated
    Under Heck

Under *Heck,* a §1983 suit is barred unless the plaintiff can demonstrate that the nature and duration of his confinement "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal court's issuance of a writ of habeas corpus."  Plaintiff cannot meet this burden.

Because Plaintiff had a conviction of sexual battery, the requirements for a diminution of sentence release (or parole) rely on more than just time computation. First, his sentences must have been eligible for diminution of sentence, which is the basis for Ms. Gryder's recalculation of his sentence.[64] Second, he had to have an approved residence plan prior to release.[65] If either of these

---

[63] R. Doc. 1, ¶1.
[64] Specifically, Plaintiff' sexual battery conviction was not eligible for good time or diminution of sentence.
[65] See La. R.S. §15:574.4.3(E), previously codified as Louisiana Revised Statute §15:574.4(S); *See also* Exhibit 7, pp. 5-6.

conditions are not met, Plaintiff may not have been lawfully released. Similarly, in order to satisfy

his burden under *Heck,* Plaintiff had to previously invalidate the nature and duration of his

confinement by demonstrating the invalidity of both of these conditions.

However, there is no indication that either or both of these criteria (both of which are

necessary to effect Plaintiff's release) have been previously invalidated pursuant to *Heck*. Nowhere

in Plaintiff's *Complaint* does he allege that a state or federal court has declared his June 2015-

January 2017 confinement invalid. Furthermore, there is no indication that Plaintiff filed any

petition for habeas corpus, a petition for judicial review, or any other similar parallel proceeding,

much less that his confinement was been "reversed on direct appeal, expunged by executive order,

declared invalid by a state tribunal, or called into question by a federal court's issuance of a writ

of habeas corpus."

Plaintiff's claims that he was illegally confined for 589 days past his legal release

inherently challenge the nature and duration of his incarceration. Because he cannot show that he

has met the requirements set forth in *Heck,* however, his §1983 claims against all defendants

should be dismissed with prejudice until Plaintiff meets the *Heck* requirements.[66]

## IV.    QUALIFIED IMMUNITY

### A.  Qualified Immunity Standard

The qualified immunity defense is a familiar one, and operates to protect a public official

who is performing a discretionary task.[67] Government officials, performing discretionary

functions, "generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

---

[66] *See Deleon v. City of Corpus Christi,* 488 F.3d 649, 657 (5th Cir. 2007)("a preferred order of dismissal in *Heck* cases decrees, 'Plaintiffs claims are dismissed with prejudice to their being asserted again until the *Heck* conditions are met.'").
[67] *Hale v. Townley,* 45 F.3d 914, 917 (5th Cir. 1995).

have known."[68] Qualified immunity allows officials the freedom to exercise fair judgment, protecting "all but the plainly incompetent or those who knowingly violate the law."[69]

The Courts use a two-step method in determining whether a defendant is entitled to qualified immunity.[70] The first step in the analysis is to consider whether, taking the facts as alleged in the light most favorable to the plaintiff, the defendant's conduct violated the plaintiff's constitutional rights.[71] In the second step, the district court must determine whether the right allegedly violated was clearly established at the time of the infraction. *Id.* The sequencing of the analysis has been left to the discretion of the Court to determine which of the two prongs should be analyzed first.[72] This inquiry must be undertaken in light of the specific factual context of the case, not as a broad, general proposition; The relevant, dispositive inquiry in determining whether a constitutional right was clearly established is whether it would have been clear to a reasonable official that his conduct was unlawful in the situation which he confronted.[73] "In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known."[74]

"To determine that an official is *not* entitled to qualified immunity, the court must find that every reasonable officer would have understood that the alleged conduct violated a clearly established constitutional right."[75] A defendant's subjective state of mind is irrelevant on the

---

[68] *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982).
[69] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
[70] *See Pearson v. Callahan,* 555 U.S. 223, 232, (2009)(citing *Saucier v. Katz,* 533 U.S. 194 (2001).
[71] *Pearson,* 555 U.S. at 232.
[72] *Id.* at 236.
[73] *See Id.*
[74] *Gobert v. Caldwell,* 463 F.3d, 345 (5th Cir. 2006)(citing *Hope v. Pelzer*, 536 U.S. 730 (2002) and *Beltran v. City of El Paso,* 367 F.3d 299, 303 (5th Cir. 2004)).
[75] *Brauner v. Coody,* 793 F.3d 493, 497 (citing *Lytle v. Bexar Cnty., Tex.,* 560 F.3d 404, 409 (5th Cir. 2009)).

question of whether he is entitled to qualified immunity.[76] The question of whether an official's conduct was objectively reasonable is a question of law, to be decided by this Court.[77]

"Once defendants assert the qualified immunity defense '[t]he plaintiff bears the burden of negating qualified immunity…but all inferences are drawn in his favor.'"[78] Specifically, a plaintiff must show that (1) the defendants committed a constitutional violation under current law; and (2) the defendants' actions were objectively unreasonable in light of the law that was established at the time of the actions complained of.[79]

Plaintiff brings §1983 claims against the defendants LeBlanc, Goodwin, and Gryder for alleged violations of Plaintiff's rights under the United States Constitution. For the reasons discussed in greater detail below, defendants are entitled to qualified immunity on these claims.

B. Sally Gryder

Defendant Gryder did not perform the initial time calculation for Plaintiff, but did perform four recalculations of Plaintiff's sentence. The first three recalculations that she performed cumulatively (through jail credit and diminution of sentence reductions) resulted in a release date of June 6, 2015.[80] As that release date approached, Ms. Gryder double checked Plaintiff' release date and reviewed the sentencing order and the Bill of Information, which ordered Plaintiff's charges differently.[81] Gryder took note of this discrepancy, consulted her supervisor Brenda Acklin, and sought clarification by reaching out to the Orleans District Attorney's Office.[82] She

---

[76] *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).
[77] *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force,* 330 F.3d 681, 687 (5th Cir. 2003)(internal citations omitted).
[78] *Brauner* at 497 (citing *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010)).
[79] *Zaunbrecher v. Gaudin,* 641 Fed.Appx. 340, 344 (5th Cir. 2016)(unpublished)(citing *Atteberry v. Nocona Gen. Hosp.,* 430 F.3d 245, 253 (5th Cir. 2005)).
[80] Exhibit 1, 50:17-51:4.
[81] *Id,* 52:15-54:14; *see also* exhibits 21 & 22.
[82] Exhibit 1, 52:15-54:14.

did so to ensure that Plaintiff was not released earlier than his legal release date.[83] As the record thus reflects, she acted objectively reasonably in this case by (1) seeking clarification based off of a discrepancy between the sentencing order and the bill of information, and (2) basing the recalculation of Plaintiff's sentence off of a minute entry issued by the Orleans Parish Clerk of Court. For these reasons, Ms. Gryder is entitled to qualified immunity.

###### i.    Legal Standard

The Fifth Circuit has explained that "[w]hile not a surety for the legal correctness of a prisoner's commitment, [a jailer] is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release."[84] Indeed, the Fifth Circuit has noted that where [the jailer] negligently establishes a record keeping system in which errors of this kind are likely, he will be held liable.[85] However, "if the errors take place outside his realm of responsibility, he cannot be found liable because he has acted reasonably and in good faith."[86]

In order for Plaintiff to hold Gryder liable in this case, he must show that she acted with deliberate indifference. The deliberate indifference standard is a high one.[87] In order to establish deliberate indifference, a Plaintiff must show that a state actor knew of and disregarded an excessive risk to the Plaintiff.[88] Indeed, "The state actor's actual knowledge is critical to the inquiry," as a "failure to alleviate 'a significant risk that he should have perceived but did not,' while 'no cause for commendation,' does not rise to the level of deliberate indifference."[89]

---

[83] *Id,* 53:3-17; 110:12-15.
[84] *Porter v. Epps,* 659 F.3d 440, 445 (5th Cir. 2011)(citing *Whirl v. Kern,* 407 F.2d 781, 792 (5th Cir. 1969)).
[85] *Bryan v. Jones,* 530 F.2d 1210, 1215 (5th Cir. 1976).
[86] *Id.*
[87] *Whitley v. Hanna,* 726 F.3d 631, 641 (5th Cir. 2013)(citing *Doe v. Dall INdep. Sch. Dist.,* 153 F.3d 211, 2019 (5th Cir. 1998)).
[88] *See Id.* (citing *McClendon v. City of Columbia,* 305 F.3d 314, 326 n. 8 (5th Cir. 2002)
[89] *Id.* (citing *Farmer v. Brennan,* 811 U.S. 825, 837 (1994)).

Importantly, negligent acts or omissions do not rise to the level of deliberate indifference.[90] Rather, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *she must also draw the inference.*[91]

Put in the context of this case, Plaintiff must establish that Gryder was aware of that her action of seeking clarification would cause Plaintiff to be over detained, and took no other action to abate it. Plaintiff's claim against Gryder fails in this regard, and should be dismissed.

### ii. Gryder did not act with deliberate indifference towards the risk of harm (Plaintiff being held past his release date)

Plaintiff essentially argues in this litigation that Gryder acted with deliberate indifference because she perceived a discrepancy between the sentencing order of the criminal court and the bill of information, and then sought clarification to ensure the accuracy of Plaintiff's June 2015 release date. This assertion is without merit.

First, any assertion that Gryder should be liable simply because she may have acted in contravention of DPS&C policy is easily disposed of. It is a well settled point of law that the mere violation of a prison policy does not itself state a claim for a constitutional violation.[92]

Second, it was objectively reasonable for Ms. Gryder to seek a clarification of Plaintiff's sentence to *ensure* that she was correctly computing Plaintiff's sentence. As, Ms. Gryder testified that "I don't recall ever running into that, where the order of the court – or what we call Sentencing Minutes is different from Docket Master."[93] She also testified that "if there's a discrepancy maybe in the minutes or the uniform – between the minutes and the Uniform Commitment Order of in the Bill of Information and the Sentencing Minutes or we need clarification, I wouldn't hesitate to ask

---

[90] *Farmer* at 835.
[91] *Id.* at 837.
[92] *See Jackson v. Cain,* 864 F.2d 1235, 1251-1252 (5th Cir. 1989).
[93] Exhibit 1, 123:5-8.

for clarification."[94] This, Gryder testified, is particularly true where the discrepancy would have an effect on an offender's time.[95]

Third, there is no evidence that Ms. Gryder knew that the Clerk was going to erroneously amend the minute entry. To the contrary, Gryder testified:

> I sought clarification and all they had to do was tell me – clarify that he in fact got two years and his – had they told me at the time – and not changed his minutes, I would have never recalculated his time. I think that's evident. I recalculated his time based on amended minute from Orleans Parish. I didn't have anything to do with what Orleans did.[96]

As this testimony shows, Ms. Gryder took action merely to ensure that Plaintiff was indeed sentenced to two years for his sexual battery conviction. Importantly, the record is clear that no recalculation was performed by Ms. Gryder until the Orleans Clerk of Court issued an amended minute entry *and* she received an e-mail from Donald Cassels confirming the minute entry.[97] Furthermore, Ms. Gryder testified that she believed that the amended minutes controlled in Plaintiff's recalculation.[98] Even if this belief was erroneous or in contravention of policy, it does not amount to deliberate indifference.

Finally, the record evidence clearly shows that it was not until December 2016, when she received the sentencing transcript, that Gryder realized that Plaintiff's release date should have been in June 2015.[99] This is evidenced by Gryder's responses to Plaintiff's correspondence throughout 2015, especially when she informed Plaintiff that "I did not change your sentence until after I received written verification from the District Attorney's office and a corrected minute entry from the sentencing court."[100] Upon receipt of the sentencing transcript in December 2016, the

---

[94] *Id*, 42:1-6.
[95] *Id*, 42:7-17.
[96] *Id*, 79:3-10.
[97] *Id*, 117:3-118:6.
[98] *Id*, 125:22-126:15.
[99] *Id*, 78:18-22.
[100] *See* Exhibit 9.

evidence shows that Brenda Acklin took over handling of Plaintiff's case,[101] except for Gryder sending an e-mail to Donald Cassels and actually processing his release paperwork in January 2017.[102] For this reason, Plaintiff cannot show that Gryder failed to take *any* action with knowledge that Plaintiff's overdetention, and Gryder is entitled to qualified immunity.

### iii.    Even if Gryder acted with deliberate indifference, she did not act objectively unreasonably in light of clearly established law

The United States Supreme Court has "repeatedly told courts…not to define clearly established law at a high level of generality."[103]  *In Porter,* the Fifth Circuit posited that a "jailer has a duty to ensure that inmates are time released from prison. In this context, the *Porter* Court framed the issue thusly: "[T]he issue is whether [the defendants'] actions, in light of his duty to ensure Porter's timely release from prison, were objectively unreasonable." *Porter,* 659 F.3d at 446.

While *Porter* reinforces the proposition that an offender has a clearly established right to release, *Porter* does not clearly establish that seeking clarification into a perceived discrepancy between sentencing documents is deliberate indifference. This is particularly true considering that Gryder sought clarification merely to prevent releasing Plaintiff earlier than he should have been – not to overdetain him. Here, it is axiomatic that the State of Louisiana has an interest in not releasing an offender earlier than his legal release date. As Warden Goodwin explained in his deposition, "if somebody is released in error too early, then we have to, obviously, make notifications and do a warrant, you know, issue a warrant, whatever. If he owes you more time, you got to get him picked up and let Probation and Parole know, things of that nature."[104]

---

[101] Exhibit 1, 77:21-78:15.
[102] Exhibit 17.
[103] *Trent v. Wade,* 801 F.3d 494 (5th Cir. 2015)(citing *Ashcroft v. Al-Kidd,* 563 U.S. 731, 742 (2011).
[104] Exhibit 4, 16:16-22.

This is not case where Gryder actually knew of Plaintiff's overdetention and failed to take any action; rather, the record reflects that Gryder was concerned with the possibility of releasing Plaintiff too early, which is a valid and reasonable concern. Even if contacting the District Attorney's office ultimately led to the Orleans Clerk of Court to issue an erroneous minute entry, the record is clear that Gryder did not reach out with knowledge that it would result in the overdetention of Plaintiff, or that it would otherwise violate his constitutional rights. Gryder is entitled to qualified immunity, and Plaintiff's claims against her should be dismissed with prejudice.

C.   James Leblanc and Jerry Goodwin

Plaintiff's due process claims against the defendants implicates two claims: (1) a "failure to intervene" claim, which this Court has previously indicated to implicate the doctrine of "bystander liability," [105] and (2) a theory of supervisory liability, as Plaintiff expressly alleges LeBlanc's and Goodwin's roles as a "final policymaker."[106] Defendants LeBlanc and Goodwin address each of these claims in turn.

i.   **Bystander Liability**

As the Fifth Circuit has explained, a state official may be liable under §1983 if the official (1) knows that a fellow office is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent the harm, and (3) chooses not to act.[107] In resolving whether a plaintiff has sufficiently alleged a bystander liability claim, the courts also consider whether an officer "acquiesce[d] in" the alleged constitutional violation.[108] Plaintiff's "failure to intervene" claims fail for three reasons.

---

[105] R. Doc. 39, p. 5, fn 9.
[106] R. Doc . 1, ¶24-25.
[107] *Whitley v. Hanna,* 726, F.3d at 646-647.
[108] *Id.* at 647 (internal citations omitted).

First, Plaintiff's "failure to intervene" claim against Goodwin and LeBlanc fails because, for the reasons discussed above, Gryder did not herself violate the rights of Plaintiff. It is axiomatic that an official cannot "know that a fellow officer is violating an individual's constitutional rights" if the other officer is not actually violating Plaintiff's rights. Because Gryder did not act with deliberate indifference towards Plaintiff, Goodwin and LeBlanc cannot be held liable under a theory of bystander liability.

Second, there is no evidence in the summary judgment record that either LeBlanc nor Goodwin had any personal knowledge that Gryder was violating Plaintiff's rights. As to defendant LeBlanc, there is no indication that defendant LeBlanc had any involvement whatsoever, or that he had any reason to know about Plaintiff's circumstances or his time computation. The evidence also reflects that Warden Goodwin had no knowledge that Gryder's recalculation was erroneous. Upon receiving the letter from Plaintiff in July 2015, defendant Goodwin forwarded the letter to Brenda Acklin (Gryder's supervisor), and conferred with Brenda Acklin and Sally Gryder. Warden Goodwin testified that he formed the opinion that Plaintiff's recalculation was corrected "based on the way Ms. Gryder explained it to me. Her and Ms. Acklin are the experts in that area and they explained to me how – and she showed me the adjusted court minutes and it was pretty obvious to me it was accurate at that point."[109]

Plaintiff's failure to intervene claims against Goodwin and LeBlanc should be dismissed with prejudice.

### ii.    Supervisory Liability

In Plaintiff's *Complaint,* he claims that the "misconduct [described above] was caused by the policies, practices, and customs of Defendants, in that their employee and agents regularly

---

[109] Exhibit 4, 24:8-13.

overdetain persons who are subject to release."[110] This claim fails for two important reasons. First, the record evidence reflects that Ms. Gryder did not *miscalculate* Plaintiff's sentence, in the sense that the technical computation was accurate[111] – rather, Ms. Gryder's second time computation was based off of the amended clerk's minute that misstated Plaintiff's sentence for sexual battery. Plaintiff asserts that pattern and practice liability lies in this case simply because "the employees and agents regularly over detain persons who are subject to release."   As discussed below, however,  this is insufficient to establish a pattern and practice claim against LeBlanc and Goodwin.

### a) *Legal Standard*

It is a well-established point of law that a supervisory official cannot be held liable for the acts or omissions of their subordinates under §1983.[112] Indeed, "[E]ach government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal,* 556 U.S. 662, 677, 129 S. Ct. 1937, 173 L. Ed. 868 (2009). A showing of merely negligent conduct by a supervisory official is insufficient to overcome the defense of qualified immunity. *See Whitley v. Hanna,* 726 F.3d 631, 643 (5th Cir. 2013)("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity.").

Generally, in order for a supervisor to be held liable, a plaintiff must prove (1) his personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation, such as where the supervisor

---

[110] R. Doc. 1, ¶107.
[111] There is no dispute that that the February 28, 2017 full term release date would have been correct *if* Plaintiff would have sentenced to five years on the sexual battery conviction.
[112] *See Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375, 381 (5th Cir. 2005)(internal citations omitted).

implemented or enforced unconstitutional policies which actually resulted in the plaintiff's injuries.[113]

Additionally, a supervisor may be held personally liable where a failure to supervise or train amounts to deliberate indifference and is a proximate cause of a constitutional violation.[114] In order to hold a defendant liable under such a theory, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.[115]

In order for a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular subordinates must perform.[116] Mere proof that the injury could have been prevented if the subordinate had received better or additional training cannot, without more, support liability.[117] Additionally, for liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective.[118] Furthermore, "Proof of a single instance, rather than a pattern of similar violations, normally will not sustain a plaintiff's claims that such a lack of training or supervision caused a violation of [his] constitutional rights."[119]

---

[113] *Porter,* 659 F.3d at 446 (citing *Gates v. Texas Dep't of Prot. & Reg. Servs.,* 537 F.3d 404, 435 (5th Cir. 2008)).
[114] *Id.* (citing *Brown v. Callahan,* 623 F.3d at 254 n.1 (5th Cir. 2010).
[115] *Porter,* 658 F.3d at 446 (citing *Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir. 2009)); *Brauner,* 793 F.3d. at 501 (citing *Smith v. Brenoettsy,* 158 F.3d 908, 911-12 (5th Cir. 1998)); *Estate of Davis,* 406 F.3d at 381.
[116] *See Roberts v. City of Shreveport,* 397 F.3d 287, 293 (5th Cir. 2005).
[117] *Id.*
[118] *Id.*
[119] *Cozzo v. Tangipahoa Parish Council-President Gov't,* 279 F.3d 273, 286 (5th Cir. 2002)(internal citations omitted).

*b) Plaintiff's Supervisory Liability Claims Fail Because Plaintiff's Claims*

*Against Gryder Fail*

First, defendants LeBlanc and Goodwin note that Plaintiff's "pattern and practice" claim fails against them simply because Gryder did not act with deliberate indifference. Indeed, it is a threshold requirement that an underlying constitutional violation occur before supervisory liability may attach.[120] As Plaintiff's §1983 claims against Gryder fail as a matter of law, so too must his claims against LeBlanc and Goodwin.

*c) Pattern or Practice Claims*

Plaintiff's pattern or practice claims fail as a matter of law. As the Fifth Circuit has noted, "a pattern of *similar* constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference," because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[121] The Fifth Circuit has also stated that "where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the *objectionable conduct* is the expected, accepted practice of city employees."[122]

Here, Plaintiff cannot show that DOC policy or practice caused the "objectionable conduct" in question, i.e., Gryder seeking clarification of Plaintiff's sentence. Rather, Plaintiff seeks to impose pattern or practice liability simply on the basis that there may be other offenders held past their release date – but without regard to the factual circumstances underpinning such instances.

---

[120] *Rios v. City of Del Rio,* 444 F.3d 417, 425-426 (5th Cir. 2006)("it is facially evident that this test cannot be met if there is no underlying constitutional violation")(citing *Breaux v. City of Garland,* 205 F.3d 150, 161 (5th Cir. 2000)); *Estate of Henson v. Callahan,* 440 Fed. Appx. 352 (5th Cir. 2011)(unpublished)(internal citations omitted).
[121] *Porter* at 447 (internal citations omitted).
[122] *Peterson v. City of Fort Worth,* 588 F.3d 838, 850 (5th Cir. 2009)(emphasis added)(citing *Webster v. Houston,* 735 F.2d 838 (5th Cir. 1984)).

For instance, in his own motion for summary judgment, Plaintiff relies on the 2017 LLA audit in support of his claim, which noted issues such as "DOC's process for calculating offender release dates is inconsistent, which can result in errors."[123] Notably, however, this is not a contested element in this case: Although Gryder's recalculation of Plaintiff's release resulted in Plaintiff being held past his June 2015 good time release date, the actual calculation was not wrong, just the information upon which it was based (the May 7, 2015 amended minute entry). In fact, there is no dispute that Plaintiff's good time release date (of June 5, 2015) nor his full term release date (of February 28, 2017) were improperly calculated from a mathematical perspective. This is vastly distinct from the "errors in calculation" issue identified by the LLA report, and demonstrates why Plaintiff's reliance on same is insufficient to demonstrate pattern or practice liability.

Again, Ms. Gryder's second recalculation of Plaintiff's sentence was based upon an (now known to be erroneous) minute entry by the Orleans Clerk of Court. There is no evidence, however, that the DPS&C had a policy or practice that would cause the Orleans clerk to issue an erroneous minute entry. Gryder's testimony in this regard should again be noted:

> I sought clarification and all they had to do was tell me – clarify that he in fact got two years and his – had they told me at the time – and not changed his minutes, I would have never recalculated his time. I think that's evident. I recalculated his time based on amended minute from Orleans Parish. I didn't have anything to do with what Orleans did.

Because Gryder's actions were based upon the issuance of an amended minute entry from the Orleans minute clerk, Plaintiff cannot show that DPS&C policy was the driving force behind such an action.

Furthermore, even after viewing Plaintiff's claims in a light most favorable to him, the evidence at most establishes that Ms. Gryder negligently failed to follow DOC policy regarding

---

[123] R. Doc. 51-1, p. 11.

the priority of documents for sentencing. There is no indication that Goodwin or LeBlanc had any knowledge that Gryder was likely to deviate from DPS&C policy, or even that such deviation would be likely to cause the over detention of Plaintiff or otherwise violate his rights. This cannot establish a "pattern and practice" claim, and Plaintiff's claims should be dismissed.

### d) Failure to Train

Plaintiff's failure to train claims likewise fail as a matter of law. As the United States Supreme Court has noted, any "identified deficiency in a training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still provide that the deficiency in training actually caused the...indifference[.]"[124] Again, Plaintiff's theory of liability against Sally Gryder is that she deviated from DOC policy by seeking clarification of Plaintiff's sentence. Even assuming *arguendo* that "seeking clarification" is objectively unreasonable (which it is not), Plaintiff cannot identify any particular deficiency in DPS&C's training program that caused Gryder to take such action. Even taking Plaintiff's assertions as true, DOC implemented the exact framework that is seemingly necessary (according to Plaintiff) to prevent the type of harm Plaintiff alleges: a policy that provides the basis for which to compute an offender's sentence.[125] Thus, defendants Goodwin and LeBlanc cannot be said to have failed to train employees such as Gryder, and Plaintiff's supervisory liability claims against defendants Goodwin and LeBlanc should be dismissed with prejudice.

## V.    INJUNCTIVE RELIEF

In his *Complaint,* Plaintiff seeks injunctive relief as a result of the alleged actions of the defendants.[126] In order to obtain an permanent injunction, a party is required to demonstrate that

---

[124] *See City of Canton v. Harris,* 489 U.S. 378, 391 (1989).
[125] *See* Exhibit 5, pp. 10-11; *See also* Exhibit 6, p. 7.
[126] R. Doc. 1, ¶19.

1) that the party has suffered irreparable injury; 2) that the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and 4) that the public interest would not be disserved by a permanent injunction.[127] However, as Plaintiff lacks constitutional standing to bring an injunctive relief claim, he cannot meet any of these elements, and his injunctive relief claim should be dismissed with prejudice.

Plaintiff cannot meet his burden of proving standing. In order to establish standing for the purposes of Injunctive Relief, a plaintiff must prove (1) an "injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) likelihood that a favorable decision will redress the injury.[128] "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief…if unaccompanied by continuing, present adverse effects."[129] Indeed, the "threatened injury must be *certainly impending* to constitute injury in fact," and "allegations of *possible* future injury" are not sufficient.[130]

In this case, Plaintiff is unable to establish these elements for the purposes of standing. Initially, Plaintiff cannot show that his injury is actual or imminent, as opposed to conjectural or hypothetical.[131] Plaintiff was released from incarceration in January 2013. As Plaintiff's parole narratives reflect, Plaintiff is no longer under any parole supervision under the State of Louisiana, and his sentence is complete as of February 2017.[132] There is also no indication that Plaintiff intends to return to incarceration, or into a situation where he will then be held past his release date

---

[127] *eBay, Inc., et al v. Merchexhange, L.L.C.,* 547 U.S. 388 (2006); *See also Weinberger v. Romero-Barcelo,* 456 U.S. 305, 311-313 (1982); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542 (1987).
[128] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1990).
[129] *Id.* at 564*, citing City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983).
[130] *B & D Plumbing Co. v. Finley,* 2019 U.S. Dist. LEXIS 10466, *6 (M.D. La. 1/22/2019)(internal citations omitted).
[131] *See Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014)(*Citing Lujan,* 504 U.S. at 560.)
[132] Exhibit 20.

by the defendants. Even if Plaintiff were asserting such claims, they would be entirely hypothetical and speculative. For this reason, Plaintiff's claims for injunctive relief should be denied.

## VI.    CONCLUSION

For the reasons discussed in great detail above, Plaintiff's claims against the defendants should be dismissed. Plaintiff's §1983 claims are barred by *Heck v. Humphrey,* as he has not previously invalidated the nature and duration of his confinement. Additionally, the defendants are entitled to qualified immunity. Finally, Plaintiff lacks constitutional standing to bring claims for injunctive relief against the defendants. Plaintiffs' §1983 claims against James LeBlanc, Jerry Goodwin, and Sally Gryder should be dismissed, with prejudice.

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

BY:     /s/ *James G. Evans*
James "Gary" Evans (#35122)
Assistant Attorney General
**Louisiana Department of Justice**
Litigation Division, Civil Rights Section
1885 North Third Street, 4th Floor
Post Office Box 94005 (70804-9005)
Baton Rouge, Louisiana 70802
Telephone:      225-326-6300
Facsimile:      225-326-6495
E-mail:          evansj@ag.louisiana.gov
*Attorney for Defendants*

26

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on the 30th day of April, 2019, the foregoing was filed electronically with the Clerk of Court by using the CM/ECF system.  Notice of this filing will be sent to all parties who participate in electronic filing by operation of the court's electronic filing system.

*/s/ James G. Evans*
James G. Evans