UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DE'JUAN THOMAS,
     Plaintiff

     V.                      3:17-cv-01595-SDD-EWD

SALLY GRYDER, JAMES LEBLANC,
JERRY GOODWIN, DOES 1-10
     Defendants
_____

BRIAN McNEAL,
     Plaintiff

     V.                 No. 18-cv-00736-JWD-EWD

LOUISIANA DPS&C, et al
     Defendants
_____

ELLIS RAY HICKS,
     Plaintiff

     V.                 No. 19-108-SDD-RLB

LOUISIANA DPS&C, et al
     Defendants
_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

RODNEY GRANT,
     Plaintiff

     V.               Case No.17-cv-2797-NJB-DEK

MARLIN GUSMAN, et al
     Defendants

1              DEPOSITION OF SECRETARY JAMES LEBLANC,

2     given in the above-entitled causes, pursuant to

3     the following stipulation, before Raynel E.

4     Schule, Certified Shorthand Reporter in and for

5     the State of Louisiana, at the Louisiana

6     Department of Public Safety and Correction, 604

7     Mayflower Street, Baton Rouge, Louisiana, 70802,

8     commencing at 10:00 o'clock a.m., on Thursday,

9     the 23rd day of May, 2019.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        and Pardon and Parole Board.  Is that
2        right?
3   A.   That's correct, and -- and Juvenile
4        Services -- OJJ, Juvenile Services.
5   Q.   So what you operationally over -- oversee
6        includes corrections, probation and parole,
7        Prison Enterprises, correct?
8   A.   Correct.
9   Q.   Okay.  As Secretary, you're responsible for
10        the inmates sentenced to the custody of the
11        DOC, correct?
12   A.   Correct.
13   Q.   Whether or not they're in a state-run
14        facility, a parish-run facility, or
15        private-facility.  Is that correct?
16   A.   Correct.  That's correct.
17   Q.   And if the Department of Corrections has a
18        legal duty to do something with regards to
19        an inmate, it's your job as Secretary to
20        make sure that happens, correct?
21   A.   Correct.
22   Q.   For example, the Department of Corrections
23        has a legal duty to feed its inmates,
24        right?
25             MR. EVANS:
```

1       you as Secretary?

2   A.    It -- yeah, it does, and but there are

3         other parties that are involved in that

4         responsibility.

5   Q.    It's the Department of Corrections' duty to

6         timely release inmates, correct?

7               MR. EVANS:

8               Object to form.

9               You can answer.

10              THE WITNESS:

11              It -- yeah, it is.  It's -- it's

12          our responsibility along with the Clerk

13          of Courts, along with the Judges, and

14          along with the Sheriffs Association.

15  BY MR. MOST:

16  Q.    And the department is -- of corrections is

17        legally bound to release inmates on their

18        release date, correct?

19              MR. EVANS:

20              Object to form.

21              You can answer.

22              THE WITNESS:

23              Yes.

24  BY MR. MOST:

25  Q.    For example, the Department can't release

```
 1         relevant laws, correct?
 2    A.   Correct.
 3    Q.   There's people here at the DOC whose job it
 4         is to calculate people's release date,
 5         correct?
 6    A.   Correct.  There's people throughout the
 7         department, not just here but --
 8    Q.   Yeah.
 9    A.   -- throughout the department.
10    Q.   Right, some of them are here at
11         headquarters; some of them are at David
12         Wade, et cetera?
13    A.   Right, and each individual prison.
14    Q.   Those people fall within that
15         Classifications Department.  Is that right?
16    A.   Correct.  Called Preclass at Headquarters.
17    Q.   Sometimes those people calculate an
18         inmate's sentence and find out that the
19         inmate is passed their release date,
20         correct?
21    A.   I would think occasionally that happens,
22         yes.
23    Q.   Those --
24    A.   Not -- you know, the --the issue of
25         calculating an issue of maybe finding
```

1       been a problem with releasing people
2       earlier than their release dates?
3                   MR. EVANS:
4                   Object to form.
5                   You can answer.
6                   THE WITNESS:
7                   Earlier than their release dates,
8           no.
9    BY MR. MOST:
10   Q.   Has there been a problem with releasing
11        people later than their release dates?
12   A.   There -- there has been issues, yes.
13   Q.   When did you first learn about those
14        issues?
15   A.   Well, I think 2012 probably would be the --
16        the start of it, and when I was approached
17        by Governor Jindal's group that were doing
18        the Lean Six Sigma and -- so they came to
19        us and asked us what -- you know, what
20        areas is probably your biggest challenge
21        and -- and, you know, time comp has been a
22        real complicated issue throughout our
23        department.  It's a -- I call it a living
24        document, because it changes every year
25        depending on legislation that's changed.

```
 1        Administration.  It wasn't the Governor's
 2        Office.
 3   Q.   Yeah.
 4   A.   It was the Commissioner's Office at the
 5        time.
 6   Q.   The Commissioner's Office came to you and
 7        said what are some issues that we can look
 8        into, you suggested time computation.  They
 9        did the Six Sigma Process, and it was
10        through that Six Sigma Process that you
11        learned there was a problem with people
12        being held past their release dates,
13        correct?
14   A.   Correct.
15   Q.   Okay.  So let's take a look at that Six
16        Sigma document.
17   A.   Okay.
18   Q.   Okay.  Let's mark this as "Exhibit A."
19        (Counsel hands document to witness.)  Okay.
20        So is this the document about the Six Sigma
21        thing you were just describing?
22   A.   Correct.
23   Q.   You've seen this document before?
24   A.   I have.
25   Q.   Okay.  On the third page it lists you as
```

1  A.    Okay.  So I would assume that that's what
2        they -- you know, that they -- I think they
3        had supervisor, and they -- and they
4        improved that -- that area.  I think that's
5        what they did.
6  Q.    But you learned when you read this document
7        back in approximately 2012, that there was
8        an issue with inconsistencies in the
9        quality of the work of the time computation
10        people, correct?
11  A.    Yes.
12  Q.    Okay.  Flip to the page that's entitled,
13        "Recommendations."  It's about four or five
14        pages later.
15  A.    Okay.
16  Q.    These are recommendations from the Six
17        Sigma team to the Department of
18        Corrections.  Is that right?
19  A.    Correct.
20  Q.    Which of these did you implement?
21  A.    The first bullet, the second bullet, third
22        bullet, fourth bullet, and the fifth
23        bullet.  All of them.
24  Q.    What did you do to provide consistency of
25        procedures and training, which is the third

```
 1        bullet?
 2   A.   They -- I mean, they established a training
 3        procedure that's in our department
 4        regulation to train people when they come
 5        on.  I mean, they developed a -- I forget
 6        the name of it.  It's a -- it's a training
 7        manual.
 8   Q.   That has been created?
 9   A.   Yes, sir.
10   Q.   When was that created?
11   A.   I don't know the date.  I'm sorry.
12   Q.   Okay.  Was it within the last year?
13   A.   No.  It was before that.
14   Q.   Okay.  So from this investigation back in
15        2012, you learned that thousands of people
16        are being held by the Department of
17        Corrections past their release date, right?
18   A.   I learned that there was a problem in the
19        system.  I didn't learn that the Department
20        of Corrections was holding them past their
21        release date.  I learned that there was
22        some problems between the Judges, the DAs,
23        and the Sheriffs in providing adequate
24        documentation that we could release people,
25        and if I didn't have that adequate
```

```
 1           documentation, I can't release them.
 2           That's what I learned.
 3    Q.    But you learned that thousands of people in
 4           the custody of the Department of
 5           Corrections for whatever reason were being
 6           held past their release date, correct?
 7    A.    I did.
 8    Q.    Did anyone get fired at the Department of
 9           Corrections because of that?
10    A.    No, because it -- it wasn't -- you know,
11           people have been fired over time because of
12           -- of miscalculations, but no, nobody got
13           fired over that because it wasn't just our
14           fault.
15    Q.    Did anyone get demoted?
16    A.    Not that I'm aware of.
17    Q.    Anyone get their dock -- their pay docked?
18    A.    I mean, since -- you're -- you're talking
19           about that day?
20    Q.    As a result of this investigation.
21    A.    No, no, not -- that wasn't an
22           investigation.
23    Q.    What do you call the --
24    A.    That's a study.
25    Q.    Okay.  Did anyone get their pay docked as a
```

1      result of this study?

2  A.   No.

3  Q.   A reprimand of any kind?

4  A.   No.

5  Q.   Okay.

6  A.   Again, not that I'm aware of.  There's --

7  Q.   Sure.

8  A.   -- four people between me and -- and that

9       group, so if they did, I wasn't aware of

10      it.

11 Q.   Okay.

12 A.   That's probably a better answer.  I'm not

13      aware of anybody being --

14 Q.   Yep, and I can only ask you what you're

15      aware of so.  Okay.  So let's try and

16      figure out from this document where the

17      delay came from.  Will you look at that

18      page that says, "Statewide Vitals Pre &

19      Post LSS."

20 A.   Where are you in the document?

21 Q.   It's sort of in the -- the middle.  It's --

22 A.   Statewide Vitals again?

23 Q.   Yeah, the first page that says, "Statewide

24      Vitals."

25 A.   All right.

1    Q.   And do you see where it says the baseline

2         was cycle times days, conviction to time

3         computation completed, 110 days?

4    A.   Huh-huh.

5    Q.   Okay.

6    A.   Yes.

7    Q.   Okay.  So this study figured out that the

8         average from when a person got sentenced or

9         convicted to when their time was calculated

10        by the Department of Corrections was an

11        average of 110 days, right?

12   A.   Yes.

13   Q.   Okay.  Will you turn to the page that says,

14        "Process Map & Cycle Time," and I'm going

15        to supplement this with -- you can't see it

16        on this, the comments that were also in the

17        PDF, which is right here (indicating).

18        Okay.  So we learned that the total time is

19        110 days, and you can see that this process

20        map looks at the different pieces of that

21        time, although you can see from the

22        comments, it leaves out one thing, which is

23        it says on this page here, on the comments

24        page, it says, "This does not include the

25        time it sat in the 'inbox' waiting to be

1       worked on."  Do you see that?

2   A.   I do.

3   Q.   Okay.  So this process map --

4   A.   Who's Darryl?

5   Q.   Do you know who Darryl is?

6   A.   Unh-unh.

7   Q.   I don't either.

8   A.   Okay.  I was just -- okay, I mean, can we

9        depend on Darryl for these comments?

10  Q.   I can't answer that question.

11  A.   No, I can't either so I'm -- I mean, I'm --

12  Q.   Sure.

13  A.   This is --

14  Q.   So this process map shows that the Six

15       Sigma investigation found it took 19.6 days

16       to get from the clerk of court --

17  A.   Which -- you're back on this document

18       (indicating)?

19  Q.   Yeah.

20  A.   Okay.

21  Q.   19.6 days to get from the clerk of court to

22       the jail, right?

23  A.   Huh-huh.

24  Q.   And then from the jail to the Preclass

25       facility 11 days, right?

1  A.   Correct.

2  Q.   So that's -- that's about 30 days before it

3       gets to the Department of Corrections,

4       right?

5  A.   Huh-huh, correct.

6  Q.   So the Department of Corrections is

7       responsible for the time after that at --

8       at least, right?

9  A.   Correct.

10  Q.   Okay, and we know that the total is 110

11       days, right?

12  A.   Yeah, I think that's what it said.

13  Q.   Okay.  So the majority of the -- the time

14       is in the hands of the Department of

15       Corrections?

16  A.   Well, what is the 7.27 days?

17  Q.   From my read of this document, that appears

18       to be from the time they actually start

19       working on a case to when they complete it.

20       Does that look right to you?

21  A.   Yeah.  I don't quite get the -- I -- I

22       mean, yeah, that's what it looks like to me

23       it takes 7.2 days to get them ready.

24  Q.   Huh-huh, okay.  Okay.  I think we're done

25       with this document, which is great.  Okay.

```
1              -- with the modernization project, which we
2         have gotten off the ground again, you know,
3         is -- is going to help resolve the problem,
4         and, you know, we're working on -- on --
5         still continuing to work on improving the
6         system and -- and hopefully this resolution
7         will help us get to where we need to be.
8    Q.   And by the modernization pro -- thing, are
9         you describing the effort to replace CAJUN
10        with a new computer system around 2015?
11   A.   Correct.  Well, I mean, it -- now, it's --
12        it's off the ground again.  We have --
13        they've assigned -- the division has
14        assigned seven or eight people to us to --
15        to start that project again.
16   Q.   So in approximately 2015, a couple of
17        million dollars was spent to get a new
18        computer system to replace CAJUN?
19   A.   Right.
20   Q.   The new computer system didn't work, and so
21        the Department went back to CAJUN, correct?
22   A.   Correct.
23   Q.   The next data point I have about this issue
24        comes in 2017, and I'll have you look at
25        this document, which we're going to mark as
```

1    "Exhibit C."  (Counsel hands document to
2    witness.)  This appears to me to be a grant
3    application from the Department of
4    Corrections to the Federal Government.
5    Have you seen this before?
6  A.  You -- you know, I -- I have.  I've -- I've
7    looked at it.
8  Q.  Okay.  Is it a grant application from the
9    Department of Corrections --
10 A.  Yes.
11 Q.  -- to the Federal Government?
12 A.  It -- it is -- it is, right.  Is this the
13    complete document?
14 Q.  There is the first --
15 A.  I have 15 of 19 --
16 Q.  Okay.
17 A.  -- so I don't have the whole document.
18 Q.  Exactly.  Okay.  Does this appear to be the
19    first 15 pages?
20 A.  Yeah, yeah.
21 Q.  I'm not trying to hide anything.  I'm --
22 A.  No, no, I know you're not.  I -- I just --
23 Q.  -- trying to save on printed paper.
24 A.  -- I just -- I was wondering if I had
25    signed this as an applicant.  That's why I

1          was looking for the last page.

2     Q.   Got it.  Okay, but you reviewed it at some

3          point?

4     A.   Yeah, I'm sure I did.  I don't -- I mean, I

5          don't -- we have a Grant Application

6          Section that -- that spends the time doing

7          this --

8     Q.   Huh-huh.

9     A.   -- and ultimately, I -- you know, I don't

10         always have the time to read verbatim every

11         grant application.  Knowing the gist of

12         this is to develop a web portal --

13    Q.   Huh-huh.

14    A.   -- for the department to communicate with

15         those people that we have a hard time

16         communicating with.

17    Q.   Right.  So if you look at Page 4 --

18    A.   Okay.

19    Q.   -- in the second paragraph, it says, "In

20         2017 the Department of Public Safety &

21         Corrections had an average of 200 cases per

22         month considered an 'immediate release' due

23         to these deficiencies," correct?

24    A.   Correct.

25    Q.   Two sentences later it says, "A review of

```
 1        these releases indicate the offenders were
 2        held in custody an average of 49 days past
 3        the date they would have been eligible for
 4        diminution of sentence release," right?
 5   A.   Correct.
 6   Q.   So -- so in 2017 at least there were about
 7        200 people per month or about 2400 per year
 8        being held past their release date for an
 9        average of 49 days, correct?
10   A.   Correct, but I -- I don't know whether this
11        is eliminating the -- the good time
12        credits.
13   Q.   Okay.
14   A.   I mean, I -- I think we, you know -- I'm
15        not sure if it does or not.
16   Q.   Sure.  And by "good time credit," you mean
17        CTRP credit, not statutory good time,
18        right?
19   A.   Yeah.  I'm sorry.  That's it.
20   Q.   Yeah.  I just want to make sure we're on
21        the same page.
22   A.   Yeah, that's correct.
23   Q.   Okay.  So this is about five years after
24        the Six Sigma report, this -- this
25        testiment, right?
```

```
1              MR. MOST:
2                  If you need electronic copies of
3              any of this, let me know.  I think I
4              got it all from you guys.
5    BY MR. MOST:
6    Q.   So Secretary LeBlanc, in 2017, the
7         Louisiana Legislative Auditor came out with
8         a report entitled, "Management of Offender
9         Data:  Processes for Ensuring Accuracy
10        Department of Corrections," correct?
11   A.   Correct.
12   Q.   And this is excerpts of that report,
13        correct?
14   A.   Yes.
15   Q.   Did you see this report when it came out in
16        2017?
17   A.   I did.
18   Q.   All right, and you were part of the back-
19        and-forth with the auditor providing
20        information, et cetera?
21   A.   Correct.  I was -- you know, ultimately, I
22        met with the auditors, you know,
23        occasionally.  I mean, our staff were
24        meeting with them more -- you know, on more
25        occasions than -- than I.
```

1    Q.   If you look at Page 3, which is the second
2         page --
3    A.   Okay.
4    Q.   -- these are some of the top line findings
5         of the Legislative Auditor; is that right?
6    A.   Correct.
7    Q.   It says, "Among other things" --
8    A.   Now, the definition of findings sometimes
9         is a little -- you've got to be careful on
10        how you use that word.
11   Q.   Sure.
12   A.   So anyway, these -- they don't refer to
13        these as findings.
14   Q.   You are correct.  It says, "We identified
15        the following issues."
16   A.   Right.
17   Q.   So these are issues the auditor identified.
18        Is that fair?
19   A.   Correct.
20   Q.   Okay.  As a lawyer, I appreciate --
21        appreciate the precision.  That's good.
22        One of the identified issues is "DOC's
23        process for calculating offender release
24        dates is inconsistent, which can result in
25        errors," right?

1    A.    Correct.

2    Q.    And it says, "DOC does not have any

3          policies, procedures, manuals or

4          agency-wide guidance that details the

5          correct ways to calculate release dates,"

6          correct?

7    A.    Correct.

8    Q.    Okay.

9    A.    Now, if I can, I -- I would refer to our

10         response to those, and I don't have that in

11         front of me, but I would ask that that at

12         least be included in the statements that

13         we're talking about right now, because when

14         you look at -- at the error rate in our

15         department, one thing they looked at was

16         the error rate, and they didn't understand

17         that it was a hundred entries in every file

18         and ended up being an error rate of .26 of

19         one percent, and I know I think we all

20         probably admit that we make errors

21         occasionally, you know, so it was a pretty

22         good -- pretty good percentage in my -- in

23         my opinion of the error rate that we were

24         calculating.  They didn't -- they didn't

25         understand the process in my opinion.

1    Q.   And a couple of sentencing -- couple of

2         sentences in, it says, "A training booklet

3         has been started."  Do you see that?

4    A.   Yes.

5    Q.   Okay.  It says, "A training booklet has

6         been started to step an employee through

7         that" -- "through the time computation

8         process to determine if the offender needs

9         recalculating and what Time Computation Act

10        the offender will fall under."  So do you

11        see that?

12   A.   I do.

13   Q.   And then it says, "Additionally, DOC plans

14        to provide a basic Pre-Class and Time

15        Computation training program to all new

16        hires in that department," right?

17   A.   Correct.

18   Q.   So the fact that it says "DOC plans to"

19        suggests that there wasn't previously a

20        training program provided to all new hires?

21   A.   It does.

22   Q.   Any reason to believe this statement is

23        false?

24   A.   No.  If we said it, then obviously it

25        isn't.

1    Q.   Do you know if this training booklet that
2         says was -- had been started has been
3         completed?
4    A.   No.
5    Q.   I'm going to pop over to a newspaper
6         article, which I'm going to label "Exhibit
7         F."  (Counsel hands document to witness.)
8         And if you'll look at page -- well, look at
9         the last page.  It says at the top, "In
10        addition to their attempts to replace
11        CAJUN," and this is an article dated
12        February 17, 2019, correct?
13   A.   Yes.
14   Q.   "In addition to their attempts to replace
15        CAJUN, LeBlanc wrote that DOC was working
16        on a new training manual for the time
17        computation staff.  More than a year later,
18        that manual remains unfinished."  It has
19        got a quote from Pastorick, "While not
20        fully completed, we anticipate completion
21        in the near future," correct?
22   A.   Correct.
23   Q.   So in 2017 the DOC says it was starting
24        this training document, and in 2019, it's
25        not fully completed, correct?

1    A.    Yeah, that's what this says, yeah.

2    Q.    Do you have any reason to -- to believe

3          what Pastorick said here is not true?

4    A.    No, I don't have any reason to believe it's

5          not true.

6    Q.    Without a training manual you can expect

7          people to make errors, correct?

8                    MR. EVANS:

9                    Object to the form.

10                   You can answer.

11                   THE WITNESS:

12                   Yeah.

13   BY MR. MOST:

14   Q.    And some of those errors might include

15         people being held past their release date,

16         correct?

17                   MR. EVANS:

18                   Same objection.

19                   You can answer.

20                   THE WITNESS:

21                   It could.

22   BY MR. MOST:

23   Q.    Do you know what the status of that

24         training manual is today?

25   A.    I don't.  I'll know by the end of the day.